# MARCH, 1926

## STATE OF TEXAS EX REL. MOODY, ATTORNEY GENERAL, V. GREGORY HATCHER, STATE TREASURER.

### No. 4506.   Decided March 10, 1926.

### (281 S. W., 192.)

**1.—Constitution—State University—Sale of Lands—Permanent or Available Fund.**

By the Constitution of the State, Article 7, Sections 10, 11, 12, 15, lands set apart to the university fund and the proceeds of sales thereof are made a part of its permanent fund and directed to be invested in bonds of which the interest only is subject to appropriation by the Legislature for the purposes of the University. (Pp. 334, 335.)

**2.—Same—Sale of Oil—Leases—Royalty.**

The disposition by the State of oil underlying university lands, though under the usual form of lease subject to payment of royalties on the oil produced, is in effect a sale of a part of such realty. The revenue derived therefrom is by the Constitution made a part of the permanent fund of the University, and not of its available fund subject to appropriation. Stephens County v. Mid-Kansas Oil & Gas Co., 113 Texas, 160, followed. (Pp. 336, 337.)

**3.—Same—Statute.**

The Act of April 3, 1925 (Laws, 39th Leg., p. 415, Ch. 175, Sec. 2), which directed the proceeds of oil leases of university land to be placed in the available building fund of the University as a special fund for building purposes was void as being in contravention of the Constitution which made such revenues a part of its permanent fund. (Pp. 335-341.)

**4.—Rents of Crop and Sales of Minerals Distinguished.**

The revenues from ordinary rentals of real estate, proceeding only from annual production of grass or other crops therefrom, are distinguishable from those derived from a disposition of the minerals, such as oil, contained in it. The latter, but not the former, constitute an alienation of a part of the reality itself. (Pp. 339, 340.)

**5.—Mandamus.**

The State Treasurer is here required by mandamus, in disregard of the unconstitutional Act of April 3, 1925, to place the proceeds derived from leases for oil production of university lands belonging to its permanent fund in its permanent fund, and not only in its available building fund.

Original application to the Supreme Court by the State, on

relation of Dan Moody, Attorney-General, for writ of mandamus against Hatcher, as State Treasurer.

The Supreme Court referred the application to the Commission of Appeals, Section B, for their opinion thereon, and in accordance therewith here orders issuance of the mandamus sought.

*Dan Moody*, Attorney-General, and *L. C. Sutton*, Assistant, for petitioner.

Said moneys constitute the proceeds of sales of lands heretofore set apart and appropriated for the establishment and maintenance of the University of Texas, and therefore the Constitution provides that the same shall constitute and become a part of the Permanent University Fund. Section 11 of Article 7 of the Constitution of the State of Texas; Stephens County vs. Mid-Kansas Oil and Gas Co., 113 Texas, 160; State v. Snyder, 212 Pac., 758.

*Van A. Petty*, as *amicus curiae*, filed brief in support of relator's position.

*Fred W. Moore*, as *amicus curiae*, filed brief *contra*.

The leases referred to in the Attorney-General's petition and, in particular, the lease attached to same, do not constitute a sale of land within the meaning of the Constitution, and are not what are commonly known as "Form 88" leases. Art. 5904f4, Vernon's Stats., 1922 Supp.; Art. 5904p, Vernon's Stats., 1918 Supp.; Baker v. Hart (N. Y.), 12 L. R. A., 60; Brown v. Shiner, 84 Texas, 505; Texas Company v. Daugherty, 107 Texas, 226; Brush v. Beecher, 110 Mich., 597; Ch. 175, Acts of 1925; Constitution of Texas, Sec. 12, Art. 7; Duff v. Keaton, 33 Okla., 92, 42 L. R. A. (N. S.), 472; Felder v. Hall Bros. Co. (Ark.), 235 S. W., 789; Harvey Coal Co. v. Dillon, 55 W. Va., 605, 6 L. R. A. (N. S.), 628; Leavitt v. Maykell, 210 Mass., 55, 89 N. E., 1056; Reed v. Rogan, 94 Texas, 177; Sec. 21, Ch. 83, Acts 1917; Art. 5904t, V. S., 1918 Supp.; Sec. 7, Ch. 83, Acts 1917; Art. 5904g, V. S., 1918 Supp.; Sec. 4, Art. 5904g, V. S. 1918 Supp.; Smisson v. State, 71 Texas, 232; State v. Evans (Minn.), 108 N. W., 958; Stephens County v. Mid-Kansas Oil & Gas Co., 113 Texas, 160; Street-Whittington Co. v. Sayres, 172 S. W., 772; Swenson v. Taylor, 80 Texas, 584; Whalen v. Manley, 68 W. Va., 328, 69 S. E., 843.

MR. PRESIDING JUDGE POWELL delivered the opinion of the Commission of Appeals, Section B.

This is an original action in mandamus filed in the Supreme Court by the State, upon the relation of the Attorney-General, against the State Treasurer, to compel the latter to place in the permanent fund of the University of Texas, the sum of $1,594,562.15, which had, at the time the petition was filed, been paid to the Commissioner of the General Land Office of Texas for the benefit of the University by the lessees of oil and gas rights upon and under certain lands belonging to the University in Reagan County. The respondent treasurer has filed no answer, but the record discloses that he has refused to place these funds in the permanent fund because an Act of the Legislature approved April 3, 1925, places such proceeds in the available building fund of the University. On the other hand, the Comptroller takes the view that this money belongs to the permanent fund under the provisions of the Constitution.

The pertinent provisions of the Constitution read as follows:

"The Legislature shall, as soon as practicable, establish, organize and provide for the maintenance, support and direction of a university of the first class, to be located by a vote of the people of this State, and styled 'The University of Texas,' for the promotion of literature, and the arts and sciences, including an agricultural and mechanical department." (Sec. 10, Art. 7.)

"In order to enable the Legislature to perform the duties set forth in the foregoing section, it is hereby declared that all lands and other property heretofore set apart and appropriated for the establishment and maintenance of the University of Texas, together with all the proceeds of sales of the same, heretofore made or hereafter to be made, and all grants, donations and appropriations that may hereafter be made by the State of Texas, or from any other source, shall constitute and become a permanent university fund. And the same as realized and received into the treasury of the State (together with such sum belonging to the fund, as may now be in the treasury), shall be invested in bonds of the State of Texas, if the same can be obtained; if not, then in United States bonds; and the interest thereon shall be subject to appropriation by the Legislature to accomplish the purpose declared in the foregoing section; provided, that the one-tenth of the alternate sections of the land granted to railroads, reserved by the State, which were set apart and appropriated to the establishment of the University of Texas, by an act of the Legislature of February 11, 1858, entitled, 'An Act to establish "The University of Texas," shall not be

included in or constitute a part of the permanent university fund.'" (Sec. 11, Art. 7.)

"The land herein set apart to the university fund shall be sold under such regulations, at such times, and on such terms as may be provided by law; and the Legislature shall provide for the prompt collection, at maturity, of all debts due on account of university lands heretofore sold, or that may hereafter be sold, and shall in neither event have the power to grant relief to the purchasers." (Sec. 12, Art. 7.)

"In addition to the lands heretofore granted to the University of Texas, there is hereby set apart, and appropriated, for the endowment, maintenance, and support of said university and its branches, one million acres of the unappropriated public domain of the State, to be designated and surveyed as may be provided by law; and said lands shall be sold under the same regulations, and the proceeds invested in the same manner, as is provided for the sale and investment of the permanent university fund, and the Legislature shall not have power to grant any relief to the purchasers of said lands." (Sec. 15, Art. 7.)

The leases from which these proceeds have arisen were executed by the State under the Act of 1917. Until the Act of 1925 aforesaid, the royalties were by *statute* applied to the permanent fund. In fact, the same Legislature which passed the Act of April 3, 1925, also on March 10, 1925, enacted a leasing law, Section 7 of which contains the following provisions:

"Royalty and all other sums shall be due and payable to the State at Austin, Texas, and shall be paid to the Commissioner of the General Land Office and he shall transmit all remittances in the form received to the State Treasurer, who shall credit the permanent University fund with all amounts received from royalty."

However, under the Act passed in less than thirty days thereafter, we find the following section:

"Section 17. Distribution of Funds.—The proceeds arising from activities under this law, and Chapter 5 thereof, which affect lands belonging to the public free school fund and the permanent fund of the several asylums, shall be credited to the permanent funds of said institution. All proceeds paid or collected from activities under this law affecting the lands belonging to the permanent fund of the University of Texas, shall be credited by the State Treasurer to the available fund of such institution, provided that all such funds shall be held by the' Board of Regents of the University in a special building fund

and shall be expended only for the erection of buildings and equipping same, or for other permanent improvements. All proceeds arising from the activities affecting lands other than those belonging in the public free school fund, the University and the several asylums, shall be credited to the game fund."

There can be no question but that respondent is correct in his position, unless it must be held that this law last quoted is in violation of our State Constitution. If so, then the statute must fall and the Constitution prevail. As already quoted, Section 11 of Article 7 of the latter instrument provides that all lands belonging to the University, *"together with all the proceeds of sales of the same,"* shall constitute and become a permanent University fund. Furthermore, that as the same is realized and received into the treasury of the state, it shall be invested in bonds of the State of Texas, if available. Otherwise, the investment shall be in bonds of the United States of America. The interest only on such bonds may be appropriated by the Legislature for the establishment and maintenance of a university of the first class. This brings us to a consideration as to whether or not these royalties are proceeds of the sale or other taking of University lands. If so, then the funds belong to the permanent fund.

In the first place, it is well settled by the decisions of our Supreme Court that oil is a part of the land and can be sold in place. Not only so, but it is equally well settled that the ordinary form of oil lease, in general use, is, in effect, a sale of a portion of the land. See: Stephens County v. Mid-Kansas Oil & Gas Company, 113 Texas, 160, 29 A. L. R., 566, 254 S. W., 290. In that case, the court said:

"While not necessary to the decision of the case, the Court of Civil Appeals announced a sound rule when it declared: 'An oil lease investing the lessee with the right to remove all the oil in place, in consideration of his giving the lessor a certain per cent thereof, is, in legal effect, a sale of a portion of the land.' Southern Oil Co. v. Colquitt, 28 Texas Civ. App., 296, 69 S. W., 169."

The oil lease involved in the instant case is, in all substantial and material respects, like the one under consideration in the Stephens County case, supra. The consideration in the University leases, as provided by statute, is $2.00 per acre and a sum of money equal to a royalty of $\frac{1}{8}$ of the value of the gross production of petroleum from said land. The royalty is not $\frac{1}{8}$ of the oil, but that proportion of the value of the oil. By reason of the similarity of the leases involved, it seems quite clear that the

University lease was, in effect, a sale of a portion of the land. In this case, there is no attack upon the validity of the leases here involved. There is no doubt that the proceeds of the oil involved in this litigation came from land belonging to the University and that these funds belong to it. The only question before us is to determine to which fund of the University they belong. For this reason, it is not necessary to here determine the contentions raised by those who have desired to file amicus curiae briefs.

Our view of the situation presented in this case coincides with the views of the Supreme Court of Wyoming, as shown by its opinion in the case of State v. Snyder, 29 Wyo., 163, 212 Pac., 758. We quote from that case as follows:

"A fundamental fact seems to have been quite overlooked. A document may have a certain, definite effect as between the parties thereto, and may determine the relationship and rights existing between them. But we are not at all concerned here with a subject of that kind. We are dealing here with only one side of the contract, the side that receives or is entitled to the royalty and rent, and the dispute exists only between the two beneficiaries on that one side—the permanent fund and the income fund. If a trustee, with power, acting for two beneficiaries, makes a lease or any other contract with a third party, this lease or contract will not at all affect the relationship or rights of the beneficiaries as between themselves, unless, of course, these rights are, in accordance with the true facts, specifically provided for, which is not done in this case. Hence the rights of the beneficiaries as between themselves must be sought for outside of the provisions of the leases involved in the case at bar. This must be clear. Oil and gas, while in situ, are part of the realty; part of the corpus of the land. When a portion of it is taken away, the proceeds necessarily arise out of the corpus, and it is humanly impossible to change that simple, plain, physical fact. The character of the proceeds can, obviously, at least as between the beneficiaries, in no possible manner be changed by the nature of the documentary authority pursuant to which the oil and gas is taken out of the ground. Documents do not possess the power of an alchemist; neither do they wield a magician's wand. Whether the oil be taken out of the ground pursuant to a license, lease, sale or any other grant, or without any authority whatever, could not in the slightest degree affect the physical fact that it comes from the corpus of the land. If taken and disposed of at all, the

effect is clearly a permanent disposition of that much of the corpus, the principal, of the land, and, irrespective of the authority pursuant to which that is done, the proceeds must go to the beneficiaries according to the rights existing between them—in this case to the permanent fund to which, according to the intention of the Constitution, the corpus of the property is dedicated—and we can by no subterfuge take it therefrom by simply saying that royalties are rents."

This Wyoming case bears a striking resemblance to the case at bar. In the Constitution of that State, it was provided in Section 2 of Article 7 as follows:

"The following are declared to be perpetual funds for school purposes, of which the annual income only can be appropriated, to-wit: * * * All moneys arising from the sale or lease of sections number sixteen and thirty-six in each township in the state, and the lands selected or that may be selected in lieu thereof."

Section 7 of Article 7 of that Constitution contains the following language:

"The income arising from the funds mentioned in the preceding section, together with all the rents of the unsold school lands, and such other means as the Legislature may provide, shall be exclusively applied to the support of free schools in every county of the state."

Oil royalties from the lands described in Section 2 just above quoted, as said by the court, began coming into the State Treasury in ever-increasing amounts. The Legislature, desiring to foster the betterment of the schools of that State, passed an Act setting aside a portion of these royalties to the current needs thereof. The Supreme Court of the State held that oil royalties might in a sense be "income" or "rent" within Section 7 heretofore quoted by us. Still it was, after all, a taking of a part of the corpus of the land and, therefore, under Section 2 aforesaid, belonged to the permanent fund of the schools. So holding, the statute was declared unconstitutional, null and void. Again, we quote from the court:

"A great many cases are cited defining the term 'royalty,' and declaring it to be 'rent,' 'in the nature of rent,' or 'analogous to rent.' Not one of these cases deals with the subject under consideration here. Most of the cited cases are from Iowa, Illinois, Missouri, Pennsylvania and West Virginia. Yet in each one of these states, as will be hereafter shown, the courts have held specifically, and without leaving any doubt on the proposition, that under circumstances similar to those in the case

at bar royalty on mineral leases is a part of the corpus of the property, and that the principal of the royalty belongs to the party entitled to the corpus—the permanent fund—and in no event more than the interest thereon belongs to the party who is entitled to the income therefrom."

If it should be contended that oil, when severed from the land, becomes personalty, that fact is immaterial and would not change the status of such property. It is provided in our Constitution that the "*proceeds*" of the land which is gone shall become part of the permanent fund. In other words, not only the realty but the resulting personalty is a part of that fund. Of course, proceeds arising from an alienation or taking of land, or any portion thereof, is usually money or personalty. It was the intention of the framers of our fundamental law that this land, and each portion thereof, should always be in the permanent fund. It was foreseen that it might be best to sell it. In that event, it was expressly provided that the substitute for the land should take its place in the permanent fund.

Since 1883, the statutes of this State have provided for the classification of public lands into agricultural, pasture and timber lands. And, the sale or lease of the pasture lands not timbered has been authorized. Under this law, it is generally known that the University has leased its pasture lands for grazing purposes and that the rentals arising therefrom have not been placed in the permanent fund. Since grass and growing crops are a part of the realty generally, it might be contended that the proceeds from a sale of the grass must also become a part of the permanent fund of this institution. That question is not before us in the case at bar. But, if it was, it seems quite clear to us that the courts recognize a distinction between minerals taken from the land and crops reproducing themselves annually or oftener. The former is a *permanent* taking of the *corpus* of the property. The latter does not in any sense permanently deplete the value of the land. Grass dies down each year and comes back in due season even if not eaten by cattle. This difference in these parts of realty has been recognized since Sir William Blackstone wrote his commentaries. For instance, we quote as follows from Lord Blackburn in the case of Campbell v. Wardlaw, 8 App. Cas., 641:

"The principle upon which the whole matter depends is the same both in English and in Scotch law, and I should be inclined to think that it would be very much the same in every country, for it is the nature of things that causes it to be so. Where there is 'produce,' such as minerals, which, when once taken

away, is never replaced, it is in a very different position from, I may say, apples or fruits of that kind, which are annually reaped and which replace themselves. That they are different in the nature of things is obvious enough. When there is an estate consisting partly of minerals or things of that sort and partly of animal products in the other sense, such as fruits and the like, and that estate comes to a person with a limited interest, the remainder being in somebody else, the question would rise: What is to be done with the produce? The law of England, and, I believe, of every country, the feudal law, and the civil law, too, would say that in that case the person who has the limited interest takes, beyond all doubt, the annual produce, the grass, the apples, and things of that sort, and applies them to his own use as he pleases, as long as his interest lasts. But it would follow, from the strict rule which I have mentioned before, that minerals, whether the mines have been opened or not, would remain a part of the soil belonging to the person who was to have the ultimate interest in the soil; the remainderman, as he would be called in England, or the fiar as he would be called in Scotland, would take them all."

In the case of Gowan v. Christie, L. R. 2 Sc. App., 284, Lord Cairns said:

"Although we speak of a mineral lease or a lease of minerals, the contract is not in reality a lease at all in the sense in which we speak of an agricultural lease. There is no fruit, that is to say there is no increase. There is no sowing or reaping, in the ordinary sense of the term, and there are no periodical harvests. What we call a mineral lease is a sale out and out of a portion of the land. It is a liberty given for a specific length of time to go into and under the land and to get certain things there if he can find them and to take them away, just as if he had bought so much of the soil."

A leading English work on the law of real property is Leake's "Law of Property in Land." On page 55 of Vol. 2 thereof, we find the following language:

"A lease of minerals or a license to take minerals for a term of years is equivalent to a sale out and out of so much of the soil itself as consists of the minerals to be taken, and the rent reserved upon a mineral lease is not like the ordinary rent or reservation of annual profits, but in effect a payment in instalments of the price of the minerals sold. It is usual to reserve it in the form of a royalty, that is a proportion of the minerals worked or of their value."

American courts, as shown in the opinion in the Wyoming case, supra, follow the English holding that minerals are a part of the soil and when once removed are gone forever. In other words, there is a *final* and *permanent* taking of a *portion* of the *land*.

In closing its opinion in the Wyoming case, supra, the court spoke as follows:

"We realize that this decision is of vital importance, and may disappoint expectations of relief which, to say the least, would be welcome to many under present economic and financial conditions. We have no doubt that a decision upholding the constitutionality of the legislative acts in question would have met with popular approval. But in doing so we should have been derelict in our duty. We think it clear, and beyond any reasonable doubt, that Chapters 66 and 147 of the Session Laws of 1921, in so far as they contemplate and direct the payment of royalties from mineral leases of school lands into the land income fund, is in contravention of Section 2 of Article 7 of the Constitution of this State, and hence null and void; and the writ of mandamus prayed for herein must accordingly be, and the same is hereby, denied."

We entertain the same thought as we reach our conclusion in the case at bar. Our opinion may shatter the fondest dreams of those who love the University of Texas and who are convinced that its present emergency needs demand the spending of these large sums of money as rapidly as they are received. A shackless campus is much to be desired. But, however desirable new buildings may be at this time, we would not be justified in setting aside the work of the forefathers who wrote into the fundamental law of this great empire State provisions for a university of the first class. Those patriots evidenced a deep concern for public education from the common school to the university. They knew, as do all of us, that schools, like individuals, would not be established upon a safe foundation in the absence of a permanent fund or endowment. Consequently, they established such a fund. They doubtless did not know what these lands were worth. They probably felt that the State was rich in its natural resources and that some day these lands would constitute a great and sufficient endowment. If they did so dream, they had the gift of prophetic ken, for there is every promise now that the proceeds of the University lands will bring to this great institution an endowment fund second to none. The gradual accumulation of the permanent fund may delay for a time the erection of some of the new buildings.

But, the inconvenience of this partial delay may well be offset in the blessed assurance that comes to those whose future rests at all times upon a safe and permanent foundation. A large endowment may, in times of crisis, save this institution from actual want. It may be best for the University that the work of the founders of Texas be not overturned. At any rate, the people alone, through an amendment to their Constitution, have any such power. Neither the Legislature nor the courts can set aside a clear constitutional provision.

Being thoroughly convinced that the royalties from University lands are a part of the permanent fund of that institution, we think they should be placed there, and thereafter invested according to the express provisions of our State Constitution. We think the Act of April 3, 1925, in so far as it affects the question herein discussed, contravenes the Constitution itself and is therefore null and void.

We recommend that the mandamus issue against respondent as prayed for by the relator.

The opinion of the Commission of Appeals is adopted and mandamus awarded.

                    *C. M. Cureton*, Chief Justice.