### DeNOYA et al. v. ARRINGTON, Ex'r, et al.

No. 21240.   Opinion Filed Dec. 13, 1932.

Petition and Supplemental Petition for Rehearing Denied April 4, 1933.

Holcombe, Lohman & Barney and R. A. Barney, for plaintiffs in error.

Gray & Palmer and Wilson & Duncan, for defendants in error.

Louis N. Stivers, Osage Tribal Atty., amicus curiae.

T. J. Leahy, C. S. Macdonald, and F. W. Files, amici curiae for numerous members of the Osage Tribe of Indians.

McNEILL, J.  This case arises out of the construction of a last will and testament of a deceased Osage allottee involving an Osage headright  The facts are not in dispute.

It appears that Odell DeNoya Bighorse was an allotted and duly enrolled member of the Osage Tribe of Indians of less than half Indian blood; that she had been granted a certificate of competency on May 3, 1911; that on January 10, 1927, she made and executed her last will and testament, containing, in part, the following provisions:

"First. I direct the payment of my funeral expenses and expenses of my last illness.

"Second. I direct the payment out of my estate of all loans made for my benefit by my mother, Mrs. John Bradshaw.

"Third. I give and bequeath to Joseph Bighorse in case he is my husband at the time of my death the sum of $100, provided, however, if he is not my husband at the time of my decease, he to receive nothing from my estate.

"Fourth. I give, devise, and bequeath all the rest, residue, and remainder of my estate, real and personal and mixed, including my headrights, and inherited rights in the Osage Tribe of Indians of which I may die seized, to my children, Cecelia Laverne DeNoya, Mary Otella DeNoya, and Wesley DeNoya, Jr., to share and share equally alike therein.

"* * * In witness whereof, I, Odell DeNoya Bighorse, Osage allottee, No. 1789, roll No. 1908, after this my last will and testament consisting of two sheets of paper, subscribed my name this the 10th day of January 1928. * * *"

The will was thereafter transmitted to the Secretary of the Interior for approval. It

was received by the office of the Commissioner of Indian Affairs on February 7, 1928. It was subsequently approved by the Secretary of the Interior upon the recommendation of the Commissioner of Indian Affairs that it be approved in pursuance of the provisions of the Act of April 18, 1912 (37 Stat. L. 86-88). subject to the right of the husband of the testatrix to take under the will or under the laws of the state of Oklahoma. Said allottee died January 14, 1928. At the time of her decease her indebtedness was in excess of $35,000, which had been incurred subsequent to the issuance of her certificate of competency. This appeal is concerned with what interest, if any, the creditors of said decedent have in the headright of said decedent for the satisfaction of their claims, in view of the fact that said decedent possessed no real or personal property except $3,200 in cash in the hands of the Superintendent of the Osage Indian Agency, which was being held by said superintendent by reason of a controversy arising out of an adjudication of incompetency pending in Rogers county.

The plaintiffs in error are the legatees and devisees under said last will and testament and have appealed to this court from the judgment of the district court of Osage county, wherein it was held that the estate of said decedent should be held open until all claims of the creditors of said decedent should be paid in full from the future income from the headright of said decedent as against the contention of said legatees that said estate was insolvent and should be closed. and thereby enable them to receive their pro rata part of said income under the provisions of said will, for the reason that said creditors were not entitled under the various acts of Congress to have such income appropriated to the settlement of their various claims.

A "headright" may be considered as the right of the tribal members and their heirs to share in the distribution of the funds received from the oil, gas, and mineral rights which were reserved to the tribe as a communal interest.

The question presented for determination turns upon the construction and effect of the acts of Congress in dealing with the Osage Tribe of Indians relative to the income from the mineral rights reserved to said tribe. There is a distinct difference between the income which has accrued to an Osage headright prior to the death of the allottee and that which may accrue subsequent thereto. In the instant case it does not appear to be questioned that the creditors would be entitled to have all funds of this nature and character which had accrued to the credit of said decedent at the time of her death, or accruing from such funds during the fiscal quarter of her decease, to apply to the liquidation of the debts incurred by said decedent, but it is maintained by the plaintiffs in error that said creditors, in the absence of a specific act of Congress, cannot apply the income derived from the headright of a deceased Osage allottee accruing after the death of such allottee beyond the fiscal quarter within which such allottee died, to the payment of their claims against the estate of such decedent.

In determining whether the income accruing to an Osage headright subsequent to the death of such allottee is an asset of the estate of such deceased Osage allottee, which can be taken by an administrator or an executor and applied to the payments of the debts of such decedent, we shall refer to some of the pertinent portions of the various acts of Congress. The Osage Tribe of Indians purchased their lands with their own money from the Cherokee Tribe, and this land was to be held in trust by the United States for the use and benefit of said Osage tribe. Prior to the Osage Allotment Act of June 28, 1906, 34 Stat. L. 539, the title to the lands and funds for said tribe remained in the tribe. By said Act of 1906, the lands were divided in severalty among the 2,229 members of said tribe, with certain reservations. limitations, and restrictions.

Section 1 of said Act of 1906 deals with the enrollment of the tribe. Section 2 provides for the selection and division of the lands belonging to the Osage Tribe of Indians among the enrolled members of the tribe. Paragraph 7 of said section 2 provides, in part, as follows:

"That the Secretary of the Interior, in his discretion, at the request and upon the petition of any adult member of the tribe, may issue to such member a certificate of competency, authorizing to sell and convey any of the lands deeded him by reason of this act, except his homestead, which shall remain inalienable and nontaxable for a period of 25 years, or during the life of the homestead allottee. if upon investigation. consideration, and examination of the request he shall find any such member fully competent and capable of transacting his or her own business and caring for his or her own individual affairs: Provided, that upon the issuance of such certificate of competency the lands of such member (except his or her homestead) shall become subject to taxation. and such member, except as herein provided, shall have the right to manage. control, and dispose of his or her lands

the same as any citizen of the United States: Provided, that the surplus lands shall be nontaxable for the period of three years from the approval of this act, except where certificates of competency are issued or in case of the death of the allottee, unless otherwise provided by Congress: And provided, further, that nothing herein shall authorize the sale of the oil, gas, coal, or other minerals covered by said lands, said minerals being reserved to the use of the tribe for a period of 25 years, and the royalty to be paid to said tribe as hereinafter provided: And provided, further, that the oil, gas, coal, and other minerals upon said allotted lands shall become the property of the individual owner of said land at the expiration of said 25 years, unless otherwise provided for by act of Congress."

This 25 year period has now been extended until April 8, 1958, by Act of March 2, 1929, 45 Stat. L. 1478. It is to be observed that, notwithstanding the granting of certificates of competency to the allottees, said section 2 specifically prohibits the sale of the oil, gas, coal, or other minerals covered by said land therein mentioned.

Section 3 of said act provides:

"That the oil, gas, coal, or other minerals covered by the lands for the selection and division of which provision is herein made are hereby reserved to the Osage Tribe for a period of 25 years from and after the 8th day of April, 1906. * * *"

Section 4 of said act provides:

"That all funds belonging to the Osage Tribe, and all moneys due, and all moneys that may become due, or may hereafter be found to be due the said Osage Tribe of Indians, shall be held in trust by the United States for the period of 25 years from and after the 1st day of January, 1907, except as herein provided:"

In reference to the segregation of the funds and the placing of the same to the credit of the individual members of said Osage Tribe, said section 4 provides:

"First. That all the funds of the Osage Tribe of Indians, and all the moneys now due or that may hereafter be found to be due to the said Osage Tribe of Indians, and all moneys that may be received * * * shall be segregated as soon after January 1, 1907, as is practicable and placed to the credit of the individual members of the said Osage Tribe on a basis of a pro rata division among the members of said tribe, as shown by the authorized roll of membership as herein provided for, or to their heirs as hereinafter provided, said credit to draw interest as now authorized by law; and the interest that may accrue thereon shall be paid quarterly to the members entitled thereto. * * *"

Paragraph 2 of said section provides for the depositing of the royalty received from oil, gas, coal, and other mineral leases in the Treasury of the United States to the credit of the members of the tribe and the distribution of the same, as follows:

"Second. That the royalty received from oil, gas, coal, and other mineral leases upon the lands for which selection and division are herein provided * * * and all moneys received from grazing lands, shall be placed in the Treasury of the United States to the credit of the members of the Osage Tribe of Indians as other moneys of said tribe are to be deposited under the provisions of this act, and the same shall be distributed to the individual members of said Osage Tribe according to the roll provided for herein, in the manner and at the same time that payments are made of interest on other moneys held in trust for the Osages by the United States, except as herein provided."

In further considering the termination of this trust period, section 5 of said Act of 1906 provides:

"That at the expiration of the period of 25 years from and after the 1st day of January, 1907, the lands, mineral interests, and moneys, herein provided for and held in trust by the United States shall be the absolute property of the individual members of the Osage Tribe according to the roll herein provided for, or their heirs, as herein provided, and deeds to said lands shall be issued to said members, or to their heirs, as herein provided, and said moneys shall be distributed to said members, or to their heirs, as herein provided, and said members shall have full control of said lands moneys, and mineral interests, except as hereinbefore provided."

Section 6 of the Act of 1906 provides as follows:

"That the lands, moneys, and mineral interests, herein provided for, of any deceased member of the Osage Tribe shall descend to his or her legal heirs, according to the laws of the Territory of Oklahoma, or of the state in which said reservation may be hereinafter incorporated, except where the decedent leaves no issue, nor husband nor wife, in which case said lands, moneys, and mineral interests must go to the mother and father equally."

This appears to be the only provision in any of the acts of Congress relative to the descent of the mineral interests after the decease of an Osage allottee.

The Circuit Court of Appeals of the 10th Circuit, in the case of Taylor v. Tayrien, 51 F. (2d) 884, on August 3, 1931, has given a detailed discussion of the various acts of Congress in dealing with the question of whether or not the headright of an Osage Indian of less than one-half blood with a certificate of competency passed to his trus-

tee in bankruptcy. In this case special observation was made of the fact that Judge Kennamer, being the trial judge of Northern District of Oklahoma, held that the headright did not pass, and that Judge Vaught of the Western District of Oklahoma also held likewise in Re Denison, 38 F. (2d) 662. In the Denison Case, Judge Vaught said:

"In the various acts of Congress relating to the Osage Indians from 1906 up to and including the Act of 1929, the only provision for the sale of a headright that is made according to our investigation of these acts, is the Act of April 12, 1924 (43 Stat. 94), and is as follows: 'Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That any right to or interest in the lands, money, or mineral interests, as provided in the Act of Congress approved June 28, 1906 (34 Stat. at Large, 539), entitled "An Act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes," and in acts amendatory thereof and supplemental thereto, vested in, determined, or adjudged to be the right or property of any person not an Indian by blood, may, with the approval of the Secretary of the Interior, and not otherwise, be sold, assigned, and transferred under such rules and regulations as the Secretary of the Interior may prescribe.'

"This act specifically provides for the sale of a headright belonging to any person not an Indian by blood, and since Congress has made no provision for the sale of an Osage headright nor for the incumbrance of an Osage headright, but has retained jurisdiction of this particular property for the benefit of the members of the tribe, it certainly could not be subject to execution. It would not be subject to the laws of the state in which it is located, and could not be considered as an asset in bankruptcy unless said bankrupt were a person 'not an Indian by blood.' "

Judge McDermott, in the Tayrien Case, supra, speaking for the court, held that no Indian of the Osage Tribe had a right to alienate his headright, and that it was not subject to judicial process. In that case the Osage Indian was less than one-half blood with a certificate of competency. In that case the court said:

"While there may be room for interpretation in some of these statutes, a survey of all of the acts clearly shows: (a) Congress has not relinquished control over any Osage, no matter his degree of blood. The last act passed deals with the rights of those of less than half-blood in at least two particulars: (b) Neither has the tribe, nor Congress, relinquished control over the minerals. The last act passed reaffirms and extends the title of the tribe thereto and

expressly says that the royalties and bonuses 'shall belong' to the tribe. * * *

"It is also plain that while Congress has found apt words to free from restrictions the surplus allotments of some Indians and the homesteads of others, it has refrained from the use of any such language as to headrights, except in the one case of non-Indian owners, and then only with the approval of the Secretary. When we start with a situation where no one of these classes of property—surplus, homestead, and headrights—is alienable, and where by the gradual process of legislation, first one class (surplus) is freed from restrictions in the hands of certain tribal members; and later another class (homesteads) is freed in the hands of other members; and still later the third class (headrights) is freed in the hands of non-Indians; in such a situation it seems impossible to say that Congress intended the third class to be alienable by any other person than the non-Indians specifically covered. Moreover, it has long been the policy of this government to construe statutory language in favor of the Indians. In Choate v. Trapp, 224 U. S. 665, 32 S. Ct. 565, 569, 56 L. Ed. 941, the court said: 'But in the government's dealings with the Indians the rule is exactly the contrary. The construction, instead of being strict, is liberal; doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith.'

"Again reading the statutes as a whole, we are impressed with the idea that Congress intended to preserve these mineral rights as a last bulwark against the improvidence of the Indian. * * *

We conclude that no Indian of the Osage Tribe has the right to alienate his headright and that it is not subject to judicial process."

In the case of Taylor v. Jones, decided August 31, 1932, 51 Fed. (2d) 893, a similar question was involved to that which was presented in the Tayrien Case, supra. The only difference being that the bankrupt was not a member of the Osage Tribe, but was Kaw allottee of less than one-half Indian blood with a certificate of competency. The Circuit Court of Appeals of the 10th Circuit, in an opinion by Judge McDermott, held that the alienation of a headright was restricted solely to those who were not of Indian blood, and that this right to alienate the headright of an Osage allottee did not extend to those outside of the Osage Tribe when of Indian blood. In each of these cases a petition for certiorari was denied by the Supreme Court of the United States, Taylor v. Tayrien, 284 U. S. 672, 76 L. Ed. 569, 52 S. Ct. 1237; Taylor v. Jones, 284 U. S. 663, 76 L. Ed. 562, 52 S. Ct. 40.

In the Tayrien Case, supra, it was said:

"On April 12, 1924, Congress passed an act (43 Stat. 94) which is of great significance. It is the first and last statute that deals which the sale of headrights. We quote the entire statute, italicizing the significant words: 'That any right to or interest in the lands, money, or mineral interests, as provided in the Act of Congress approved June 28, 1906 (34 Stat. at Large, 539), entitled "An Act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes," and in acts amendatory thereof and supplemental thereto, vested in, determined, or adjudged to be the right or property of any person not an Indian by blood, may with the approval of the Secretary of the Interior and not otherwise be sold, assigned, and transferred under such rules and regulations as the Secretary of the Interior may prescribe."

There is no act of Congress providing for the sale, incumbering, or alienation of headrights by those of Indian blood. See In re Irwin, 60 F. (2d) 495. If there is no such provision, how can it be consistently urged that the income from the headright of deceased Osage Indian allottee accruing subsequent to his death over an indefinite period can be taken to satisfy the debts of such allottee? This would be, in effect, an incumbering, assigning, transferring, or an alienation of such headright unauthorized by Congress.

In the case of In re Irwin, 60 F. (2d) 495, Judge McDermott, speaking for the Circuit Court of Appeals, 10th Circuit, said:

"Section 70a of the Bankruptcy Act provides: 'The trustee of the estate of a bankrupt, * * * shall in turn be vested by operation of law with the title of the bankrupt, as of the date he was adjudged a bankrupt, * * * to all * * * (3) powers which he might have exercised for his own benefit, * * * (5) property which prior to the filing of the petition he could by any means have transferred or which might have levied upon and sold under judicial process against him.' 11 USC sec. 110 (a). 11 USCA sec. 110 (a) * * *

"Congress has expressly provided that Osage headrights may be transferred with the approval of the Secretary of the Interior when they are the property of those not of Indian blood. Such headrights are therefore property which could 'by any means' have been transferred and are within the broad and inclusive terms of the Bankruptcy Act. * * *

"We conclude that an Osage headright, owned by a person not of Indian blood, passes to his trustee in bankruptcy. Any other conclusion would permit white persons to invest large sums in these headrights, and retain them against their creditors, contrary to the letter and spirit of the Bankruptcy Act."

This rule does not apply to the Indian owners of headrights. If a trustee in bankruptcy cannot subject an Osage headright owned by a person of Indian blood for the benefit of creditors, it seems patent that an administrator or an executor cannot subject the income from such headright to the payment of claims of creditors of a deceased Osage allottee. Were it not for the Bankruptcy Act, there could not even be a disposal of the headright owned by those not of Indian blood for the benefit of creditors. However, such person not of Indian blood could dispose of such headright upon the approval of the Secretary of the Interior.

Section 4 of the Act of March 3, 1921, 41 Stat. L. 1249, provides:

"Sec. 4. That from and after the passage of this act, the Secretary of the Interior shall cause to be paid at the end of each fiscal quarter to each adult member of the Osage Tribe having a certificate of competency his or her pro rata share, either as a member of the tribe or heir of a deceased member, of the interest on trust funds, the bonus received from the sale of leases, and the royalties received during the previous fiscal quarter. * * * Provided, further, that all just existing individual obligations of adults not having certificates of competency outstanding upon the passage of this act, when approved by the Superintendent of the Osage Agency, shall be paid out of the money of such individual as the same may be placed to his credit in addition to the quarterly allowance provided for herein."

In this connection, the Act of March 2, 1929, section 4 of said act, provides:

"Upon the death of an Osage Indian of less than one-half of Osage Indian blood, or upon the death of an Osage Indian who has a certificate of competency, his moneys and funds and other property accrued and accruing to his credit, shall be paid and delivered to the administrator or executor of his estate to be administered upon according to the laws of the state of Oklahoma."

Defendants in error stress the contention, by reason of the words "accrued and accruing,", under said section 4 of the Act of March 2, 1929, that this would be sufficient to justify the estate to be held open for the purpose of receiving the income from decedent's headright to pay the claims of the creditors of said deceased allottee. Under the provisions of said Act of 1906, and the acts amendatory and supplemental thereof, it is observed that the minerals are reserved as a communal interest to the Osage Tribe. A review of the various en-

actments of Congress in dealing with the oil, gas, and minerals reveals that no provision has been made whereby authority was given to the Indian to dispose of such headright or mineral interest, except by will, which in all cases must be approved by the Secretary of the Interior. The aforesaid section 4 of said Act of March 2, 1929, specifically designates "his moneys and funds, and other property accrued and accruing to his credit." We are of the opinion that these words, "accrued and accruing," were fitly and advisedly used by Congress, and as applied to an Osage headright, do not extend beyond the fiscal quarter as provided in said section 4.

In the instant case whatever moneys were due the decedent from any sources whatever at the time of her decease were those which had accrued to her as an enforceable right or claim by reason of the acts of Congress. They accrued to her credit, and the participle "accruing" is in a measure synonymous with the word "accrued." If decedent's pro rata share of the income from the mineral rights, accruing during the fiscal quarter of her decease, had not actually been placed in the Treasury of the United States to the credit of the members of the Osage Tribe of Indians and distributed to her, as provided by paragraph 2 of section 4 of the Act of 1906, the same may be properly construed as coming within the provisions of said Act 1929 during such quarter as "accrued and accruing," as such income derived from said headright came into existence prior to her death and became vested in her as an enforceable right, although it actually had not and could not have been placed to her credit prior to the expiration of such fiscal quarter. It is conceded that the creditors could not sell, attach, or in any manner effect an alienation of such headright, either prior or subsequent to the death of said allottee. To permit the estate to be held open to pay the claims of the creditors from the income of the headright in question, would be discordant to every act of Congress dealing with the headright, and permit defendants in error to do indirectly what cannot be done directly. The headright is restricted, and any income accruing thereto subsequent to the death of the allottee cannot be appropriated in any manner by the creditors of such deceased allottee. It is the "last bulwark" that the government holds for the Osage Indian against his prodigality and improvidence. To hold otherwise would be to thwart the will of Congress on this subject, and it would quickly lead to the incurring of indebtedness by the members of the Osage Tribe of Indians equal

to the value of their headrights, and thereby indirectly incumber and alienate the headright, which Congress has uniformly and steadfastly sought to safeguard and protect for the allottees and their heirs. The government is interested not only in the allottees, but also in their heirs.

We conclude that the income accruing to the headright of a deceased Osage allottee subsequent to the death of such allottee is not an asset of the estate of such decedent which can be appropriated for the payment of the claims of creditors.

Judgment is reversed and remanded, with directions to enter such judgment as may not be inconsistent with the views herein expressed.

CLARK, V. C. J., and HEFNER, CULLISON, and SWINDALL, JJ., concur. LESTER, C. J., and ANDREWS and KORNEGAY, JJ., dissent. RILEY, J., absent.