## LEAHY v. STATE TREASURER OF OKLAHOMA et al.

No. 24635.     June 18, 1935.

Rehearing Denied Sept. 25, 1935.

Louis N. Stivers, T. J. Leahy, C. S. Macdonald, and F. W. Files, for plaintiff in error.

C. W. King and A. L. Herr, for defendants in error.

GIBSON, J. The parties will be referred to herein as they appeared in the trial court.

The plaintiff commenced this action in the district court to recover a sum of money paid to the state of Oklahoma as income

tax for the year 1931, alleging that the amount so paid was illegally assessed against him and collected by the defendants. From a judgment in favor of the defendants, plaintiff has appealed.

The plaintiff is a member of the Osage Tribe of Indians and duly enrolled as such under the Act of Congress of June 28, 1906, and under the authority of said act (34 Stat. 539, 542, sec. 2, par. 7) a certificate of competency was issued to him on the 24th day of May, 1924. The tax sought to be imposed by the state under chapter 66, article 7, Session Laws 1931, is an income tax upon the plaintiff's pro rata share of the income derived from the sale of the common mineral resources belonging to said tribe.

It is the contention of the plaintiff that, since the mineral resources of the Osages remain restricted and nontaxable by the state under the provisions of the Act of June 28, 1906, and successive acts of Congress, the income derived therefrom by the individual members of the tribe is also nontaxable by the state; and further, since under the authority of said act the United States holds said resources in trust for said tribe, the act of the state in attempting to collect such tax amounts to an attempt on the part of the state to levy a tax on a federal instrumentality.

In support of his contention the plaintiff cites numerous authorities, some of which are highly persuasive. We are of the opinion, however, that the case of Choteau v. Burnet, 283 U. S. 691, 75 L. Ed. 1353, is controlling upon this court on the question presented herein, and we feel constrained to adopt the rule laid down and to follow the reasoning expressed by the Supreme Court of the United States in that case.

The facts in Choteau v. Burnet, supra, were in all respects the same as the facts in the case at bar, except the question there presented was whether the United States had authority to levy and collect a tax against a like income of an Osage Indian under the General Revenue Act of 1918 (40 Stat. 1057). The question was decided in the affirmative, and the court, in fixing the status of the Indian with reference to the particular property in question, considering the same in the light of the applicable acts of Congress, reasons and holds as follows (after referring to the certificate of competency issued to the plaintiff and the act authorizing same):

"The petitioner, then, was competent to hold and make any use (except to grant mining leases) of all his lands. All except his homestead were taxable, and were freely alienable without control or supervision of the government. His share of the royalties from oil and gas leases was payable to him, without restriction upon his use of the funds so paid. It is evident that as respects his property other than his homestead his status is not different from that of any citizen of the United States. In the process of gradually changing the relation between the Indian and the government he has been, with respect to the income in question, fully emancipated. Compare United States .v. Waller, supra [243 U. S. 452, 37 S. Ct. 430, 61 L. Ed. 843.] It is true, as petitioner asserts, that as to his homestead he still remains a restricted Indian. But this fact is only significant as evidencing the contrast between his qualified power of disposition of that property and his untrammeled ownership of the income in controversy. The latter was clearly beyond the control of the United States. The duty to pay it into petitioner's hands, and his power to use it after it was so paid, were absolute. Work v. Mosier, 261 U. S. 352; Work v. Lynn, 266 U. S. 161. The claim that with respect to this income the petitioner was restricted, and therefore exempt from the tax laid by sections 210 and 211 (a) must fail."

Although in the instant case the state of Oklahoma and not the federal government is attempting to levy and collect the tax, the reasoning of the court in Choteau v. Burnett, supra, is fully applicable to the case at bar, and the holding therein is controlling upon this court. In that case the Supreme Court of the United States has definitely fixed the status of an Osage Indian with relation to the income in question; the plaintiff here occupies the same position as the taxpayer in that case with reference to federal restrictions, and the court there has established the existence of all requisites to taxing jurisdiction in the state of Oklahoma. His share of the royalty from oil and gas leases was payable to him without restrictions upon his use of the funds so paid; his status is no different from that of any citizen of the United States. In the process of gradually changing the relation between the Indian and the government, he has been, with respect to the income in question, fully emancipated; his ownership in the property is untrammeled; the duty on the part of the government to pay the income into his hands and his power to use it after it was so paid, were absolute. The government had fully released its control.

It is plain that the income here in question was free from government restrictions, and was not subject to control by any federal agency. Therefore a tax levied by the state could not be a direct burden upon a governmental instrumentality, and could not be termed an interference by the state with the operations of the federal government. Indian Motorcycle Co. v. United States, 283 U. S. 570, 75 L. Ed. 1277.

If follows that the plaintiff's income is not restricted property, and is not under the control of any governmental agency within the meaning of the acts of Congress, and is therefore taxable by the state of Oklahoma.

The judgment of the trial court is affirmed.

OSBORN, V. C. J., and BAYLESS, BUSBY, PHELPS, and CORN, JJ., concur. McNEILL, C. J., and RILEY, J., dissent. WELCH, J., absent.

On Rehearing.

McNEILL, C. J. (dissenting). I am unable to agree with the conclusion announced by the court, and in view of the importance of the question I most respectfully indicate the grounds of my dissent.

The question involves the right of the state of Oklahoma to collect an income tax on the funds paid to a member of the Osage Tribe of Indians who had received a certificate of competency. These funds were derived from the bonuses, rentals, and royalties paid by the lessees of the tribal mineral leases which had been given with the approval of the Secretary of the Interior. The funds obtained from these mineral sources, under the Congressional Act of June 28, 1906, are held in trust by the United States and placed to the credit of the individual members of the Osage Tribe according to the authorized roll of membership, or their heirs on the basis of a pro rata division.

It is the contention of the plaintiff in error, a member of said tribe, that the pro rata share of these funds received by him is not subject to the state income tax; that the state of Oklahoma is without jurisdiction or authority to assess or collect the same, and that he should have judgment for the recovery of the tax paid under timely protest.

On the other hand, the state maintains that the issuance of a certificate of competency to a member of the Osage Tribe of Indians was in effect a removal of restrictions on the land of plaintiff except as to the sale of his homestead, and that plaintiff, after receiving such certificate of competency, was entitled to receive his pro rata share of said trust fund, free from all restrictions or control by the federal government; that the Acts of Congress of June 28, 1906, and of March 3, 1921, removed all restrictions of plaintiff as to the funds herein involved; and that such funds, by reason thereof, became subject to state taxation.

The trial court sustained the tax. This court affirms that judgment. In my opinion, this is error.

It is my view that the state is without power or authority to impose an income tax on the funds in question for the primary reason that the mineral reserves under the lands of the Osage Tribe of Indians are held in trust with the United States as a federal instrumentality, partaking of the nature of a communal property interest, by virtue of treaties which the United States entered into with said tribe on November 10, 1808, and September 29, 1865 (Kappler's Laws and Treaties, vol. 2, pp. 95, 878), the Osage Allotment Act (34 Stat. L. 539.) passed by Congress on June 28, 1906; that the federal instrumentality is exempt from the state taxing power; that this is not a tax upon the individual Indian, but it is a tax upon these mineral resources which are clearly a part of the permanent taking of the corpus of the land which permanently depletes its value and which reserves were purchased by the Osage Tribe with its tribal funds; that it does not follow that the state can impose a tax on such a fund, or corpus of the land, for the same reason that it is within the power of the United States government to subject these mineral resources to a federal tax; that the state has a limited power under this class of property and cannot subject the same to the common burden. It is my opinion that these views are supported by the following authorities: Choteau v. Burnet, 283 U. S. 691, 75 L. Ed. 1353; Gillespie v. Oklahoma, 257 U. S. 501, 66 L. Ed. 338; Shaw v. Gibson Zahniser Oil Corp., 276 U. S. 575, 72 L. Ed. 709; Pollock v. Farmers Loan & Trust Co., 157 U. S. 429, 39 L. Ed. 759; Weston v. Charleston, 27 U. S. (2 Pet.) 449, 7 L. Ed. 481; Choate v. Trapp, 224 U. S. 665; Work v. U. S. ex rel. Mosier, 261 U. S. 352, 57 L. Ed. 693; Parker v. Riley, 250 U. S. 66, 63 L. Ed. 847; Cuff v. Koslosky, 165 Okla. 135, 25 P. (2d) 290; Meriwether v. Lovett, 166 Okla. 73, 26 P. (2d) 200; State v. Snyder, 29 Wyo. 163, 212 P. 758; State v. Hatcher (Tex.) 281 S. W. 192.

There is no dispute as to the facts nor

as to the procedural method to recover the tax in question. It is conceded that plaintiff in error is a member of the Osage Tribe of Indians to whom a certificate of competency was issued by the Secretary of the Interior on May 24, 1924. During the year 1932, plaintiff received, as a member of such tribe, the amount in question as his pro rata share of the funds derived from said mineral resources, over which the government specifically retained control and held in trust for the Osage Tribe of Indians, which express mineral restrictive feature, so far as I have observed, does not appear in any other congressional act relating to other tribes of Indians.

On November 10, 1808, the United States entered into a treaty with the Osage Tribe of Indians whereby the United States recognized said tribe as a political entity and placed the Great and Little Osage Nations under its protection and assumed the position of guardian and protector of said Tribe. This guardianship over the Tribe has never been abandoned by the federal government, and it remains solely with Congress to determine when it shall cease. United States v. Ramsey, 271 U. S. 468, 70 L. Ed. 1039.

The Osabe Tribe of Indians, in 1883, purchased their lands with their own tribal funds from the Cherokee Tribe, and this land, surface and mineral rights, was held in trust by the United States for the use and benefit of said tribe. Under the Act of 1906, the tribal lands were divided, in so far as the surface was concerned, in severalty among the members according to the authorized tribal rolls, and tribal deeds were issued with certain limitations, reservations, and restrictions. In none of the acts of Congress is there to be found any relinquished control by Congress over the minerals lying in and under said tribal lands. Tayrien v. Tayrien (C. C. A.) 51 F. (2d) 884; De Noya v. Arrington, 163 Okla. 44, 20 P. (2d) 563.

Under the Act of June 28, 1906, supra, 34 Stat. at Large 539, 543, Congress retained continuing control over these mineral resources. The act provided in part as follows:

"That the oil, gas, coal, or other minerals covered by the lands for the selection and division of which provision is herein made, are hereby reserved to the Osage Tribe for a period of twenty-five years from and after the eighth day of April, nineteen hundred and six; and leases for all oil, gas, and other minerals covered by selection and division of land herein provided for, may be made by the Osage Tribe of Indians through its tribal council, and with the approval of the Secretary of the Interior, and under such rules and regulations as he may prescribe; provided, that the royalties to be paid to the Osage Tribe under any mineral lease so made shall be determined by the President of the United States; and provided further, that no mining of or prospecting for any of said mineral or minerals shall be permitted on the homestead selections herein provided for without the written consent of the Secretary of the Interior; Provided, however, that nothing herein contained shall be construed as affecting any valid existing lease or contract." Sec. 3.

The seventh paragraph of section 2 of said act also provided:

"That nothing herein shall authorize the sale of the oil, gas, coal or other minerals covered by said lands, said minerals being reserved to the use of the tribe for a period of twenty-five years, and the royalty to be paid to said tribe as hereinafter provided."

In the case of Pollock v. Farmers Loan & Trust Co., 157 U. S. 427, 39 L. Ed. 759, it was held that a tax on the rents or income of real estate was a direct tax within the meaning of the Constitution of the United States. That case has been very fully reported and contains all the briefs and the stenographer's reports of all the arguments of counsel.

After such an exhaustive presentation Mr. Justice Fuller, in part, said:

"As according to the feudal law, the whole beneficial interest in the land consisted in the right to take the rents and profits, the general rule has always been, in the language of Coke, that 'if a man seized of land in fee by his deed granteth to another the profits of those lands, to have and to hold to him and his heirs, and maketh livery secundum formam chartae, the whole land itself doth pass. For what is the land but the profits thereof?' Co. Lit. 45. And that a devise of the rents and profits or of the income of lands passes the land itself both at law and in equity. 1 Jarm Wills (5th Ed.) *798 and cases cited.

"The requirement of the Constitution is that no direct tax shall be paid otherwise than by apportionment—the prohibition is not against direct taxes on land, from which the implication is sought to be drawn that indirect taxes on land would be constitutional, but it is against all direct taxes—and it is admitted that a tax on real estate is a direct tax. Unless, therefore, a tax upon rents or income issuing out of lands is intrinsically so different from a tax on the land itself that it belongs to a wholly dif-

ferent class of taxes, such taxes must be regarded as falling within the same category as a tax on real estate eo nomine. The name of the tax is unimportant."

In that case reference was made to Weston v. Charleston, 27 U. S. (2 Pet.) 449. The ordinance of the city of Charleston was involved and a levy was attempted to be made upon the interest from the bonds and not upon the bonds. It was held that a tax on the income of the United States securities was a tax on the securities themselves, and that an income tax upon the interest of the bonds was not sustainable, although Mr. Justice Thompson and Mr. Justice Johnson dissented from that view. In the Pollock Case there was also cited, the case of North Central Ry. Co. v. Jackson, 74 U. S. (7 Wall.) 262, 19 L. Ed. 88, wherein it was held that a tax upon the interest payable on the bonds was a tax not upon the debtor, but upon the security. In view of the holding of the Supreme Court of the United States in the Pollock Case, supra, that a tax upon the rents or income issuing out of the land is the same thing as a tax upon the real estate, it seems to me that by analogy the same reasoning is applicable when a tax is sought to be imposed upon that which comes from the corpus of the land in the way of bonuses, rentals, and royalties from mineral reserves over which the government imposed restrictions for the purpose of protecting the Indians from their own incompetency, when, in fact, such bonuses, rentals, and royalties constitute a permanent taking of the corpus of the land, a permanent depletion of the soil, a consumption of the mineral resources which reduces the mineral value, and thereby produces a reduction of the value of the land. See Cuff v. Koslosky, 165 Okla. 135, 25 P. (2d) 290; State v. Snyder, 29 Wyo. 163, 212 P. 758; State v. Hatcher (Tex.) 281 S. W. 192; Work v. U. S. ex rel. Mosier et al., 261 U. S. 352, 67 L. Ed. 693; Parker v. Riley, 250 U. S. 66, 63 L. Ed. 847.

Oil and gas in place are minerals, and so long as they remain unsevered from the soil are a part of the corpus of the land. Cuff v. Koslosky, supra. In that case it was said:

"After oil and gas have been discovered and produced from the premises under either the oil and gas lease or the mineral deed, the corpus of the land becomes changed and depleted in proportion to the amount of the oil and gas lifted, captured, and severed from the soil. The removal of a portion of the corpus of the land from its unseen mineral reservoirs is not replaceable. After this removal, depletion, or production, there has

been to that extent an alienation and dismemberment of the common-law freehold estate in the land."

The rights in the minerals are valuable property rights. Meriwether v. Lovett, 166 Okla. 73, 26 P. (2d) 200. These minerals, when removed from the corpus, deplete and dismember the soil and in that respect are unlike grass, growing crops, and fruits reproducing themselves.

The usual oil and gas mining lease is equivalent to a license to take from the corpus of the land that portion of the corpus of the land itself as consists of the oil and gas to be taken under the lease as though it were an out and out sale of that particular portion of the corpus of the land. State v. Hatcher, supra, citing Gowan v. Christie, L. R. 2 Sc. App 284: Leake's Law of Property in Land, vol. 2, p. 55. It must be remembered that these mineral resources are not confined to the land, allotted in severalty, under the Act of 1906, supra, but these rights and reserves are tribal interests and not interests in severalty. The mineral reserves were never divided in severalty. The owner of the land of an Osage allotment does not individually own the minerals thereunder. These reserves remain as tribal property and the free right of alienation of such reserves or property rights in same, without question, has never been consented to by Congress directly or indirectly. Even under the Act of Cong. April 12, 1924 (43 Stat. L. 94), a person not of Indian blood could not sell his right to, or interest in, the lands, monies, or mineral interests of the tribe without the approval of the Secretary of the Interior. The granting of a certificate of competency did not remove the restrictions imposed on the mineral reserves.

Mr. Chief Justice Taft, in the Works Case, supra, in discussing the bonus which was paid for an oil and gas lease secured from members of the Osage Tribe, said:

"It was, in effect, a supplement to the royalties already determined. * * *

"Of course, it involved a consumption and reduction of the mineral value of the land, but so does a royalty."

In the case of Parker v. Riley, supra. Mr. Justice Van Devanter, discussing an oil and gas lease in that case, stated that the minerals (oil and gas) were part of the homestead.

In the case of Superintendent of Five Civilized Tribes, for Sandy Fox, Creek No. 1263, v. Commissioner of Internal Revenue, 55 S.

9

Ct. 820, 822, 79 L. Ed. \_\_\_, Mr. Justice Mc-Reynolds, in speaking for the Supreme Court of the United States, said:

"\* \* \* The general terms of the taxing act include the income under consideration and if exemption exists it must derive plainly from agreements with the Creeks or some Act of Congress dealing with their affairs.

"Neither the Creek Agreement of 1901, nor the Supplemental Agreement (1902) conferred general exemption from taxation upon Indians; homesteads only were definitely excluded, although alienation of allotted lands was restricted.

"The suggestion that exemption must be inferred from the Act of April 26, 1906 (34 Stat. L. 137) or Act of May 27. 1908 (35 Stat. L. 312), is not well founded. The first of these extended restrictions upon the alienation of allotments for twenty-five years unless sooner removed by Congress, and provided: 'Sec. 19. \* \* \* That all lands upon which restrictions are removed shall be subject to taxation, and the other lands shall be exempt from taxation as long as the title remains in the original allottee.' This exemption related to land and not to income derived from investment of surplus income from land. Moreover, the act itself was superseded by the second one which did not contain the quoted provision, but declared: 'Sec. 4. That all land from which restrictions have been or shall be removed shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes. \* \* \*'

"We find nothing in either act which expresses definite intent to exclude from taxation such income as that here involved. See Shaw v. Oil Corp., 276 U. S. 575, 581."

The majority opinion relies upon that case, but I construe that case as distinguishable from the facts at bar. We are not considering the same character of a case. In that case funds which had been derived from a restricted allotment of a full-blood Creek Indian were invested, and Mr. Justice McReynolds very properly said that:

"If exemption exists it must derive plainly from agreements with the Creeks, or some Act of Congress dealing with their affairs."

In that opinion it was pointed out that the exemption related to the land and not to the income derived from the investment of a surplus income from land. Under the facts in the instant case we are not concerned with income of that class and character. The term "income," as so used, was given its ordinary meaning. In the case at bar it is my opinion that the common acceptation of

the meaning of the term "income" cannot be correctly extended to cover bonuses, rentals, and royalties derived from restricted oil and gas mining leases of the Osage Tribe. In the instant case we are concerned with the restricted mineral resources of the Osage Tribe, and the tax sought to be imposed upon the distributed funds in question is equivalent to a direct tax upon the bonuses, rentals, and royalties which constitute a component and integral part of the restriced mineral resources. These mineral reserves and the right of participating in the distribution of the funds therefrom under the provisions of the Allotment Act of June 28, 1906, and acts amendatory thereof and supplemental thereto, are inalienable, whether the headright is owned by Indians with certificates of competency, or by Indians without certificates of competency, the sole exception as to alienability being that under the Act of 1924, headrights, when owned by persons not of Indian blood, may be sold with the consent and approval of the Secretary of the Interior, a headright being the right of enrolled members of the Tribe, or their heirs, to share in the distribution of the funds received from the oil, gas, and mineral received from bonuses, rentals, and royalties paid on oil and gas mining leases given by the tribe under the approval of the Secretary of the Interior. De-Noya v. Arrington, supra. Taxes are not debts. See City of Sapulpa v. Land, 101 Okla. 22, 223 P. 640. They become an enforceable lien on the property on which they were exacted. How could such a tax be enforced against an incompetent Indian by the state? The state cannot impose an income tax upon the income of Liberty bonds of a competent or incompetent Osage Indian, which were purchased through the United States government, nor can the state impose an income tax upon the salaries of the federal judges who reside within the state. The principle is analogous to the instant question. The Liberty bonds and income therefrom are exempt from taxation. Likewise, the mineral resources are exempt, as well as the proceeds therefrom. The state is without power to sell these mineral reserves or enforce any tax against the same. These resources are federal instrumentalities, and it is fundamental that federal instrumentalities may not be taxed by a state. McCulloch v Maryland, 4 Wheat. 316, 4 L. Ed. 579; Weston v. Charleston, 2 Pet. 449, 7 L. Ed. 481; New York Bank of Commerce v. Commissioners of Taxes & Assessments, 2 Black, 620, 17 L. Ed. 451; Collector v. Day, 11 Wall.

113, 20 L. Ed. 122; Choctaw, Oklahoma & Gulf R. R. Co. v. Harrison, 235 U. S. 292, 35 S. Ct. 27, 59 L. Ed. 234; Indian Territory I. Oil Co. v. Oklahoma, 240 U. S. 522, 36 S. Ct. 453, 60 L. Ed. 779; Howard v. Gypsy Oil Co., 247 U. S. 503, 38 S. Ct. 426, 62 L. Ed. 1239; Large Oil Co. v. Howard, 248 U. S. 549, 39 S. Ct. 183, 63 L. Ed. 416; Gillespie v. Oklahoma, 257 U. S. 501, 42 S. Ct. 171, 66 L. Ed. 338; Northwestern Mutual Life Insurance Co. v. State of Wisconsin, 275 U. S. 136, 48 Sup. Ct. 55, 72 L. Ed. 202. To impose the questioned tax in the instant case would be placing a burden and direct charge upon the exempted principal—the corpus, the mineral resources, the bonuses, rentals, and royalties.

It is my conclusion that Congress has not released its control over the mineral resources of the Osage Tribe of Indians by granting a certificate of competency to a member of that tribe; that the tax in question is nothing short of a direct tax upon that which constitutes an integral part of the corpus of the restrictive mineral resources, the very security itself, a federal instrumentality devised for the care and protection of the members of said tribe against their own prodigality; and that such a tax is void and not sustainable, being in violation of the acts of Congress dealing with the affairs of the Osage Tribe of Indians, as well as the Constitution of Oklahoma, article 1, section 3, and article 10, section 6.

For these reasons, I dissent.

I am authorized to announce that Mr. Vice Chief Justice OSBORN and Mr. Justice RILEY concur in this dissent.