STATE  EX  REL.  KOCH, RELATOR, *v.*  BARRET, STATE
TREASURER, RESPONDENT.

(No. 1,704.)

(Submitted July 29, 1901.  Decided August 1, 1901.)

(Opinion Filed November 4, 1901.)

*Grant of Lands by United States for the Use and Benefit of
State Agricultural Colleges—Appropriation by State—Income as Trust Funds—Income from Leases.*

1.   Act of Congress February 22, 1889, granted to the state, subject to Act of
     Congress July 2, 1862, certain lands for the use of agricultural colleges.
     Act of Congress July 2, 1862, provided that lands so granted should be
     sold, and the proceeds invested as a perpetual fund, the interest to be
     appropriated to the support of at least one college in such manner as the
     legislature might prescribe.  Constitution, Art. XVII, Sec. 2, provided for
     the temporary leasing of such lands until they should be sold, and Article
     XI, Sec. 4, authorized such sale.  Article XI, Sec. 12, devoted the interest
     on invested funds from sales and rents from leased lands to the mainte-
     nance of the institutions to which the grants belonged.  Political Code,
     Secs. 3470-3519, 3590-3595, authorizes the leasing of unsold lands by the
     land commissioner, and the payment of revenues derived therefrom into
     the state treasury.  *Id.* Sec. 1516, declares that the board of education
     shall receive all funds and incomes to which any of the state educational
     institutions may be entitled to be used for the specific purpose of the
     grant.  Section 1513 provides that the state treasurer shall be the treas-
     urer of this board.  Section 1625 gives the immediate control of the State
     Agricultural College to an executive board, the treasurer of which should
     give bond to the state board of education.  *Held,* that the legislature had
     not failed to prescribe how the income from the grant should be appropri-
     ated to the support of the agricultural college, and it was the duty of the
     state treasurer to pay the warrants drawn by the executive board on the
     income in his possession.
2.   The funds and income derived from the grant were trust funds, to be dis-
     bursed through the agency of the state, and were not subject to Constitu-
     tion Art. VII, Sec. 20, providing that claims against the state other than
     for the salary or compensation of a public officer should be audited and
     allowed by the state board of examiners, and paid only on the warrant of
     the state auditor.
3.   The income from the lease of the lands granted was available for the use
     and support of the agricultural college, it not being a condition precedent
     to its right thereto that the lands should be sold, and the proceeds invested
     so as to provide an income from interest thereon.

APPLICATION for writ of *mandamus* by the state, on the rela-
tion of Peter Koch, as treasurer of the executive board of the

State Agricultural College, against A. H. Barret, state treasurer. An alternative writ was issued, and defendant moved to quash the writ and to dismiss the petition. Writ granted.

*Messrs. Hartman & Hartman,* for Relator.

*Mr. James Donovan, Attorney General,* for Respondent.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

The relator herein applied to this court on July 24, 1901, for a writ of *mandamus* to compel the defendant, as the state treasurer, to pay a certain warrant drawn upon him by the vice president and secretary of the executive board of the State Agricultural College, and in favor of the relator as the treasurer of said board, for funds with which to pay a balance of $1,500 of the current expenses of the institution for the scholastic year ending June 30, 1901.

The relator alleged in his application that the funds in the hands of the defendant had been derived from rents of lands leased by the state land commission belonging to the grant of lands made by the United States government in aid of the agricultural college; that they were, therefore, properly applicable to the payment of the warrant in question; that the account for which the warrant had been drawn had been approved and ordered paid by the state board of education, but that the defendant wrongfully refused to pay the same, in violation of his legal duty in the premises. An alternative writ was issued, requiring the defendant to pay the warrant, or to show cause on July 29, 1901, why he had not done so. The attorney general appeared in his behalf, and interposed a motion to quash the writ, and dismiss the proceeding, on several grounds, two of which he urged as conclusive against the issuance of the writ, namely: "That the legislature of the state of Montana has not appropriated the sum demanded, or any part thereof, to the maintenance of said agricultural college of the state of

Montana;" and "that there is no law authorizing the payment
to the relator of moneys derived from the leasing of lands do-
nated to the state of Montana for the use and support of said
agricultural college." The questions thus raised were then sub-
mitted for final decision, the attorney general conceding that,
if they should be decided adversely to his contention, the writ
should issue as prayed. After consideration, the court con-
cluded that the contention made by the attorney general could
not be sustained, and on August 1 ordered the writ to issue.
No written opinion was then handed down, because the court
was about to adjourn for the summer vacation. Owing to the
importance of the interests involved, however, we deem it
proper to state our reasons now for the action then taken.

Under the Act of congress approved February 22, 1889,
commonly known as the "Enabling Act," providing for the ad-
mission of Montana into the Union as a state upon equal foot-
ing with the original states, there were granted to the state,
subject to the provisions of the Act of congress approved July
2, 1862, certain lands for the use and benefit of state agricul-
tural colleges. The lands so granted were accepted on behalf
of the state, subject to the prescribed conditions, both by the
constitutional convention (Ordinance No. 1, Subdivision 7)
and by the state legislature (Session Laws of 1893, pp. 171-
173 ; Political Code, Sec. 1628). By reference to the Act of
congress of July 2, 1862, and particularly section 4 thereof, it
will be seen that it was contemplated by congress that the lands
granted by the Enabling Act should be sold; that the proceeds
should be profitably invested, so that the principal should be
forever preserved as a permanent endowment fund; and that
the interest thereof should be devoted to the support of the
college or colleges established pursuant to the declared purpose
of the grant. Neither of the Acts of congress referred to spe-
cifically provides that the land granted may be leased by the
state authorities pending a sale; but the state constitutional
convention, anticipating possible difficulty and delay in con-
verting the lands into money, and with a purpose of making

the grant profitable in the meantime, authorized the legislature
to provide by law for the leasing of all the agricultural and
grazing lands included in the grant until they should be sold.
(Constitution, Art. XVII, Sec. 2.)  The constitution also
created a state land commission, consisting of the governor,
secretary of state, superintendent of public instruction and at-
torney general, to have the "direction, control, leasing and sale"
of all lands granted to the state for educational purposes (Con-
stitution, Art. XI, Sec. 4), subject to the regulations to be
prescribed by law.  Another provision was made (Constitution,
Art. XI, Sec. 12), requiring the funds derived from the sale
of lands embraced in the several grants to the state for the use
and support of state institutions of learning, as well as funds
derived from other sources for that purpose, to be preserved
inviolate and sacred for the purposes for which they were dedi-
cated, but directing that the interest upon the invested funds,
together with the rents from the leased lands, be devoted to the
"maintenance and perpetuation" of the various institutions to
which they, the respective grants, belonged.  Pursuant to these
several provisions of the constitution, the legislature has en-
acted regulations under which, in default of sale, all agricul-
tural and grazing lands may be leased under the direction of
the state land commission for terms not exceeding five years,
and requiring the revenues derived therefrom to be paid into
the hands of the state treasurer.  (Political Code, Secs. 3470-
3519, 3590-3595; Session Laws of 1897, pp. 178, 179; Ses-
sion Laws of 1899, pp. 86-93.)  Under these provisions of law
considerable quantities of agricultural and grazing lands se-
lected for the use and benefit of the State Agricultural College
at Bozeman, have been leased, and the income derived there-
from has been paid into the hands of the defendant, as state
treasurer, to the amount of $16,000.

The first contention made by the attorney general was based
upon this language contained in Section 4 of the Act of Con-
gress of July 2, 1862:  "* * * That the moneys so in-
vested shall constitute a perpetual fund, the capital of which

shall remain forever undiminished,   *   *   *   and the inter-
est of which shall be inviolably appropriated by each state
which may take and claim the benefit of this act to the endow-
ment, support and maintenance of at least one college,   *   *
*   in such manner as the legislatures of the states may pre-
scribe   *   *   *." He argued that the legislature of this state
has enacted no provision of law under the authority of which
any interest or income derived from the grant may be applied
to the support of the college.

The state board of education was created by the legislature
under authority of the constitution (Constitution, Art. XI,
Sec. 11). This board consists of the governor, state superin-
tendent of public instruction and attorney general, *ex officio
members,* with eight other citizens, appointed by the governor,
by and with the consent of the senate. Its powers and duties
are enumerated in Chapter I, Title III, Part III of the Po-
litical Code, and are very extensive. Section 1516 declares:
"The powers and duties of said board shall be as follows:

"(1)   They shall have the general control and supervision
of the state university and the various state educational insti-
tutions.

"(2)   To adopt rules and regulations, not inconsistent with
the constitution and laws of this state, for its own government,
and proper and necessary for the execution of the powers and
duties conferred upon them by law.

"(3)   To prescribe rules and regulations for the government
of the various state educational institutions.   *   *   *

"(10)   To receive from the state board of land commis-
sioners or other boards or persons, or from the government of
the United States, any and all funds, incomes and other prop-
erty to which any of the said institutions may be entitled, and
to use and appropriate the same for the specific purpose of the
grant or donation, and none other, and to have general control
of all receipts and disbursements of any of said institutions."

It is further provided (Section 1513) that the state treasurer
shall be the treasurer of this board. Turning to Chapter IV,

Title III, Part III of the same Code, under the provisions of which the institution was established, and special regulations provided for its government and control, we find (Section 1625) that the immediate direction and control of it is vested in an executive board, consisting of five members, appointed by the governor, by and with the consent of the board of education. This latter board is required to have a secretary and treasurer, selected from its own members, or not, at the pleasure of the board, who shall give bond in such sum as may be prescribed by the state board of education for the faithful performance of his duties, and to account for all moneys coming into his hands by virtue of his office. From the various provisions of the constitution cited and the statutes enacted to carry out their evident intention, it is apparent that the state board of education is vested with the exclusive power to receive, invest, manage and control the funds derived from the sale of the lands granted to the state for the use and support of the agricultural college, and that the income therefrom is subject to the orders of the board to meet the current expenses of the institution. The defendant is the proper depositary of these funds, and is therefore liable, upon the order of the board, to pay out the income derived therefrom as current necessities demand; for under Section 1516, cited, the board is empowered "to receive from the state board of land commissioners or other boards or persons, any and all funds, incomes and other property to which any of the said institutions may be entitled, and to use and appropriate the same to the purpose of the grant or donation, and to have general control of the receipts and disbursements." It is also clear that the executive board, of which the relator is treasurer, has direct management and control of the affairs of the institution, and that it is the duty of the defendant to pay the warrants drawn by it, when ordered to do so by the state board in the exercise of its general powers. The legislature has therefore not failed to "prescribe" how the income derived from the grant shall be appropriated to the "endowment, support and maintenance" of the institution, as

was contemplated by the Act of congress making the grant.

The attorney general contended further, in this connection, that the claim for which the warrant was drawn is a claim against the state other than for a salary or compensation of a public officer, and should be audited and allowed by the state board of examiners and paid upon the warrant of the state auditor. To support this contention he cites Section 20 of Article VII of the Constitution, as follows: "The governor, secretary of state and attorney general shall constitute a board of state prison commissioners, which board shall have such supervision of all matters connected with the state prisons as may be prescribed by law. They shall constitute a board of examiners, with power to examine all claims against the state, except salaries or compensation of officers fixed by law, and perform such other duties as may be prescribed by law. And no claims against the state except for salaries and compensation of officers fixed by law, shall be passed upon by the legislative assembly without first having been considered and acted upon by said board. The legislative assembly may provide for the temporary suspension of the state treasurer by the governor, when the board of examiners deem such action necessary for the protection of the moneys of the state."

The relation of the state government to the trusts created by the provisions of the Enabling Act was considered in *State ex rel. Bickford* v. *Cook,* 17 Mont. 529, 43 Pac. 928, wherein there was a controversy over the payment of the compensation due to members of the capitol commission. It was said in that case, in substance, that lands granted by congress to provide for the erection of the state capitol, and accepted by the state, became a trust; that funds derived therefrom were trust funds, to be devoted exclusively to the purpose of the trust, through the agency of the state; that the disbursement of them was not an expenditure of the state "within the meaning of expenditures generally referred to in the constitution;" that the state officers could not use the fund for any other purpose than that designated in the Act of Congress; and that, in so far as they dealt

with that fund, they created no obligation which the state was bound to pay out of the ordinary revenues derived from taxation. Again, in *State ex rel. Dildine* v. *Collins,* 21 Mont. 448, 53 Pac. 1114, the section of the constitution cited by the attorney general was considered, and it was held that the state university bond fund was a trust fund; that the state acted in connection with it as a mere agent to execute the trust; and that, as in the administration of it no debt was or could be created against the state, the constitutional restriction as to the expenditure of the funds arising therefrom did not apply. "It is evident furthermore," this court said, "that the Act of the legislature providing for the erection of the university building did not contemplate that claims arising under the terms of the contracts for the buildings should be subject to approval by the state board of examiners." This statement was based upon a provision of the statute creating the university commission, which authorized it to draw warrants upon the state treasurer payable out of the trust funds in his hands. We think the principle of these cases applicable to the present case, and that the legislature, in defining the powers and duties of the board of education, with a view of following the spirit and intention of the Act of congress creating the trust, intended that this board should be clothed with the special and exclusive power of executing it free from the limitations and restrictions of the constitution as to the expenditure of the ordinary revenues of the state. It may be that a different rule would apply to expenditure of any moneys appropriated by the legislature out of the revenues of the state to supplement the revenues derived from the trust fund thus left to the control of the board. Upon this question, however, we express no opinion, as it was not properly before us.

Under the second ground of the motion the attorney general argued that congress, in making the grant, intended that it should become available only after a sale of the lands granted, and an investment of the moneys thus obtained, so as to provide an income from interest; that this intention is manifested

by the fact that there is nothing either in the Enabling Act or in the Act of July 2, 1862, authorizing the state to adopt a system of leasing for the purpose of creating a revenue for current necessities, and hence such revenues as have been or are derived from this source cannot lawfully be used by the board of education to pay the bill in question, notwithstanding the provisions of the constitution and statutes cited. The result of this contention is that all of these provisions are in violation of the acts creating the trust, and that to subject the fund in the hands of the defendant to the payment of the demands created by the board would be only another step in the course of mismanagement of which the state government has been guilty. We do not think this position maintainable. We think the manifest intention of congress was to create a permanent endowment, which was to be preserved inviolate; and to require that the revenues derived therefrom should be faithfully applied to the support of the institutions created, and not be diverted to other purposes. So long as this intention is carried out, we think it makes no difference what mode is adopted. The grant was made in view of conditions existing at the time, and others which might arise. It certainly could not have been intended that lands which could not be readily and speedily sold, but which, from their character and situation, could be made to yield a revenue by a system of leasing, should be allowed to lie idle and unprofitable until such time as the state could sell them, and thus comply with the strict letter of the grant. The grant was made and accepted with the existent conditions in mind, and, in our opinion, the constitutional convention, in making the provisions it did, and the legislature in providing the mode by which they are made effectual, both exhibited a wise foresight, and have thus made it possible for the people to have the present benefit of the gift of the federal government without in any way impairing its value or diverting it to improper uses.

*Writ granted.*