TOOMEY, Plaintiff, *v.* STATE BOARD OF LAND COMMISSIONERS et al., Defendants.

(No. 7,809.)

(Submitted April 6, 1938. Decided May 7, 1938.)

[81 Pac. (2d) 407.]

*Mr. E. G. Toomey,* Plaintiff, appearing *pro se,* submitted an original and a reply brief and argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. Lee Metcalf,* Assistant Attorney General, and *Mr. Wesley W. Wertz,* Special Assistant Attorney General, for Defendants, submitted an original and a supplemental brief; *Mr. Metcalf* and *Mr. Wertz* argued the cause orally.

*Mr. H. C. Hall,* Intervener, appearing *pro se,* submitted a brief and argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

Plaintiff, a taxpayer, brought this proceeding originally in this court to enjoin the defendants from entering into an agreement designated as a ''Consolidated Lease and Operating Agreement,'' which purports to pool state school lands with others in private ownership for unit operations for the production of natural gas and the apportionment of gas royalties on an acreage basis. By appropriate pleadings these facts are admitted or otherwise made to appear:

On March 27, 1930, defendants executed and delivered an ██ ██ oil and gas lease to F. E. Benedict covering 80 acres of state school land. On March 20, 1930, defendants executed and delivered a lease to Adelaide Williams covering 320 acres of such lands, and on the same day gave to J. F. O'Day a lease on 320 acres. Each lease was identical in terms, and each was for a term of five years and as long thereafter as oil or gas in commercial quantities shall be produced, not exceeding the total of fifteen years. Each required royalty payments to the state of $12\frac{1}{2}$ per cent. of the gas produced, ''exclusive of gas used for light, fuel or operating purposes in connection with the work on the lands.'' Other terms of the leases will be alluded to later herein.

Thereafter the leases were modified by changing the term from five years to ten, and the period within which the state could accept delay drilling penalties in lieu of drilling was changed from five years, as in the original lease, to ten years.

The lessees assigned their interests in the leases to the Glacier Production Company, a New Jersey corporation admitted and qualified to do business in this state, which is now the holder thereof. No wells have been drilled on any of the lands covered by the leases, but delay penalties have been paid to the state extending the time for drilling on the lands covered by the O'Day and Williams leases until March 20, 1939, and by the Benedict lease until March 29, 1939. In the vicinity of these lands are lands in private ownership on which the Glacier Pro-

duction Company holds oil and gas leases, each reserving to the land owner a 12½ per cent. royalty of the oil and gas produced.

Defendants adopted a resolution approving a proposed consolidated lease and operating agreement whereby the 720 acres of state school lands in the above mentioned leases were to be pooled with 1,200 acres of privately owned lands on which the Glacier Production Company held leases. The 1,920 acres embraced in the area constitute three contiguous sections of land lying in a direct line extending from north to south, being sections 24, 25 and 36, Township 36 North, Range 5 West. This proceeding is to enjoin the execution of that proposed agreement.

The land is situated in the Cut Bank oil and gas field. In this field the gas producing sands, where they have been tested by drilling, have not been uniform in thickness and porosity, nor has gas been found in commercial quantities in all of the tested land. None of the acreage sought to be pooled has been tested for gas by drilling wells to the gas producing horizon, and hence it is not known whether all or any part of the land is capable of producing gas in commercial quantities, or whether the thickness and porosity of the gas producing sands, if any, are uniform, or whether there will be uniformity in the quantity of gas recoverable therefrom.

Under the proposed consolidated lease and operating agreement the lessee agrees to pay as royalty one-eighth of the market price of all gas produced at the well. When gasoline is extracted, manufactured or recovered by the lessee from natural gas or casinghead gas produced from land in the unit, the market value at the well of one-eighth of the gasoline content of the gas is also paid as royalty. It provides that each of the lessors shall have gas free of cost from any gas wells in the unit for his reasonable domestic use by making his own connections at the wells at his own risk and expense, and the lessee has the right to use, free of cost, gas produced on the lands in the unit for operations thereon, and on such gas used either by the lessors or lessee no royalty is paid. The one-eighth royalty is apportioned among the lessors in proportion to the acreage held by each. The state will receive 720/1920ths thereof, and the other lessors collec-

tively will receive the balance. The duration of the agreement is limited to fifteen years from the date of the original leases. Under the proposed agreement the lessee is not obligated to protect the school lands by offset wells from drainage by wells drilled on other lands in the unit. Under the proposed agreement the lessee will not be required to pay delay drilling penalties until a well is drilled on the school lands, but will be released from so doing upon the drilling of two wells upon the unified area. Other features of the proposed consolidated lease and agreement will be discussed more at length in considering the several contentions urged in support of the claim that its execution should be enjoined.

The proposed agreement is attacked here as being unauthorized under section 1882.2, Revised Codes, for several reasons which we shall later discuss. The further contention is made that if section 1882.2 authorizes the proposed agreement and lease, then it is in conflict with constitutional provisions and the Enabling Act.

The first point raised is that the proposed agreement is not authorized by section 1882.2, for the reason that it embraces more than 640 acres. The section in part provides: ''No oil or gas lease issued on state lands shall embrace more than six hundred forty (640) acres, * * * . Nothing herein contained, or in Chapter 108 of the session laws of the state of Montana of 1927 (sections 1882.1 to 1882.24), or elsewhere, shall prevent or be so construed as to prevent the state board of land commissioners from entering into agreements for the pooling of acreage with others for unit operations for the production of gas and the apportionment of gas royalties on an acreage or other equitable basis, and from modifying existing leases and leases hereafter entered into with respect to delay rentals, delay drilling penalties and royalties in accordance with such pooling agreements and such unit plans of operation; provided, however, that such agreements shall not change the percentages of royalties to be paid to the state from the percentages as fixed in its leases.''

The paragraph in the statute authorizing pooling of acreage by its very terms provides that pooling agreements are not to be prevented because of other provisions of sections 1882.1 to 1882.24. In effect, this is a declaration of the legislature that pooling agreements are not to be restricted by the acreage limitation of 640 acres. The legislature must have realized that such a restriction is inconsistent with the principles of a unit operation and, hence, excepted them from the operation of the restriction as to acreage.

Contention is made that section 1882.2 authorizes the pooling of acreage for gas production, only in case the entire geologic structure is included in such an agreement. This contention cannot be sustained. The purpose of pooling agreements is to conserve the natural resources of an area, to promote its development in an orderly and economical manner to meet market conditions, to avoid waste and to insure a more equitable distribution of the proceeds of production. (1 Thornton on Oil & Gas, sec. 218, p. 380, and cases there cited, including *Marrs* v. *City of Oxford,* 32 Fed. (2d) 134; *C. C. Julian Oil & Royalties Co.* v. *Capshaw,* 145 Okl. 237, 292 Pac. 841; *People* v. *Associated Oil Co.,* 211 Cal. 93, 294 Pac. 717; and see *Patterson* v. *Stanolind Oil & Gas Co.,* (Okl.) 77 Pac. (2d) 83, and *United States* v. *Standard Oil Company of California,* 21 Fed. Supp. 645.).

It is true that to accomplish the maximum beneficial results sought in a pooling agreement the entire structure should be included, but there are practical reasons why this cannot always be done. In the first place, it is impossible to know in advance of drilling the exact boundaries of a structure. In the second place, there is in most cases such a diversity of ownership in the lands and royalties that it is not always possible to secure the consent of all concerned were it known in advance just what acreage constituted the entire structure. The mere fact that a pooling of less than the total area of a structure does not secure all the benefits which would flow from an inclusion of the entire area is no reason why the legislature may not authorize the acceptance of the partial benefits; in other words, part of the benefits is better than none at all.

The plan of unit operation is of comparatively recent origin. When section 1882.2 was amended in 1933 to authorize pooling agreements, it cannot be said that the legislature had any particular pooling method in mind. At that time there were different conceptions of unit operations. Mr. Glassmire in his treatise on Oil & Gas Leases and Royalties, in section 6, page 31, published in 1935, said: ''Three slightly different conceptions of 'unit operation' have been evolved. The first, or broad definition, contemplates the merging of individual lease ownership into a common property with operation thereof as a single lease; the second implies 'cooperative development and operation,' wherein each lessee operates his lease in accordance with an agreed plan respecting the whole pool; the third would effect a merging of the operating interest only, title to respective interest remaining in the individual owners. Under the latter plan, which is now more generally favored, the area is developed and operated as a single property, at the proportional expense and for the proportional benefit of the several parties in interest.'' Hence it is seen that in 1935 there was more than one plan of unit operation in vogue.

Section 1882.2 does not assume to restrict the board as to the kind of pooling agreement that it might make. So long as it pools state lands in a recognized plan of unit operation, it is acting within its rights though the plan does not undertake to embrace the entire geologic structure. There is nothing in section 1882.2 to suggest that the board was to be restricted to such pooling agreements as purported to cover the entire structure only.

Plaintiff contends that the proposed agreement is a new and joint leasing of state school lands, and that it modifies existing leases otherwise than as authorized by section 1882.2. His contention is that the authorized modifications are confined by this section to those relating to delay rentals, delay drilling penalties and royalties. The first modification complained of is that under the original leases the royalty was calculated upon the total amount of gas saved and produced, exclusive of oil or gas used for light, fuel or operating purposes in connection with

work on the lands under the lease. The proposed consolidated agreement requires payment of royalty "on gas produced from said lands and sold or used off the premises," and contains these provisions: "lessee shall have the right to use free of cost gas, oil and water produced on said lands for all operations thereon," and "each of the lessors shall have gas free of cost from any gas well on said premises for his reasonable domestic use," by making its or his own connections at the well. It is conceded here that the state cannot avail itself of the right to free gas by making its own connections at the well; hence, to the extent that the other lessors exercise their right to do so the amount of royalty fixed in the original leases is altered.

Section 1882.4 expressly provides that in all oil and gas leases royalty shall be paid "in all oil and gas produced and saved from all lands covered thereby, and not used for light, fuel and operation purposes on the leased premises." The consolidated agreement did alter the original leases in the respect contended for by plaintiff, but since the alteration made the lease conform to terms expressly authorized by statute, we think it cannot be assailed on this ground. It should be remembered, too, that the consolidated agreement adopted sections 1882.2 to 1882.19 so far as applicable and not inconsistent with the consolidated lease and agreement as a part of it as if actually written into the agreement.

The next modification complained of is that relating to the drilling obligations. The original leases provided that the lessees shall within two years after the date of the lease, drill at least one well on the leased premises not less than 6 inches in diameter to the depth of at least 1,000 feet, unless oil or gas in commercial quantities shall be encountered at a shallower depth, and that if oil or gas in commercial quantities is not found at the depth of 1,000 feet or less, the lessee shall continue drilling with diligence to such depth as may be reasonably necessary to make a reasonable test for oil or gas, and the board is given the right in its discretion to extend the time for the commencement or completion of the drilling obligation from year to year, not exceeding ten years.

The leases also provide that upon completion of a productive gas well the lessee shall proceed with reasonable diligence to drill such additional wells as may be necessary economically to test the lands. The consolidated agreement binds the operator to commence a well within one year from the date of the last acknowledgment on the agreement and to complete it with reasonable diligence to the gas or oil producing horizon. It further provides that if the first well is dry, the lessee may either commence a second well within eighteen months from the date of the agreement or cancel the agreement, and in this event the original leases shall become reinstated.

The agreement also provides that if the first well be on other than state lands, the second shall be on state lands.

The purpose of unit operation being to operate the combined area as a unit, these changes were within the contemplation of the legislature when it authorized pooling agreements.

Section 1882.2 specifically authorizes modifications with respect to delay drilling penalties. Drilling requirements and obligations are so interwoven with delay drilling penalties that modification of the one contemplates modification of the other.

The next modification complained of arises from the fact that the original leases provided that the State Land Board might curtail production upon such terms as appears to it to be just and equitable, whereas the consolidated agreement provides that after gas is produced and sold from wells producing gas only, the lessee, if he deems it inadvisable or inexpedient to produce or sell gas from any such well, may discontinue the production of gas by paying $200 per year for each well shut down. It is well known that gas cannot be stored. (*Severson* v. *Barstow*, 103 Mont. 526, 63 Pac. (2d) 1022.) The record here discloses that the Glacier Production Company is the only operator in the field marketing gas to any great extent. Local needs are already being supplied by others. Obviously, if there is no market for the gas, a condition best known by the lessee, there is nothing left to do but discontinue production. Abuse of this right by the lessee gives the state a cause of action for breach of the implied covenant to use reasonable diligence to provide

a market for the products. (*Severson* v. *Barstow,* supra.) So far as the record before us is concerned, the state cannot be injured by this course because, when the production in discontinued for want of a market, the supply is being conserved on which, when a market becomes available, it will procure its allotted royalty, and in the meantime it will obtain its proportionate share of the $200 annual payment on each well. We think this modification is within the contemplation of the legislature as a necessary part of a practical pooling agreement.

The next asserted unauthorized modification is that relating to the right of the lessee to terminate the lease. The original leases gave to the lessee the right to terminate the leases at the end of any rental year by giving thirty days' notice in writing. The consolidated lease is made terminable by the lessee at any time by paying $1. Under the consolidated lease the rentals are payable in advance. In practical effect, then, the two leases are the same in this respect, for each is terminable at any time.

The next modification complained of relates to delay drilling penalties. The original leases provided for extending drilling obligations from year to year, not exceeding ten years, upon the payment of such penalties, beginning with the third year, as the board may determine. The consolidated lease requires the commencement of a well within one year from the date of the last acknowledgment and requires completion with reasonable diligence. It provides that if the first well be a dry hole, the lessee at its option may cancel the consolidated agreement and reinstate the original leases or commence a second well in eighteen months from the date of the last acknowledgment. Since section 1882.2 specifically authorizes modification of leases with respect to delay drilling penalties, the proposed modification cannot be said to be unwarranted.

It is next contended that there has been a violation of section 1882.2 in the proposed consolidated agreement, in that there has been a change in the percentage of royalties to be paid. The original leases each provided for the payment of a royalty of 12½ per cent. of the gas. The consolidated agreement pro-

vides for the landowners' royalty of 12½ per cent. of the gas, but apportions it according to acreage. In other words, the state is allowed 720/1920ths of 12½ per cent., by reason of the fact that the state owns 720 of the 1920 acres. Section 1882.2 expressly authorizes the apportionment of gas royalties on an acreage basis. The percentage of royalty within the meaning of section 1882.2 has not been altered, but only the apportionment of that royalty among those interested in the acreage embraced in the unit operation. This apportionment on an acreage basis is expressly authorized.

The general charge of plaintiff that the consolidated lease and agreement is not a modification of existing leases, but an entirely new lease, is of no importance. The intention of the parties is made plain. They sought a pooling agreement under section 1882.2. To do so, existing leases had to be modified or changed. Whether this was accomplished by interlineation or by rewriting the leases is immaterial.

The original leases covered both oil and gas. The landowners other than the state were pooling their oil rights as well as gas rights. As to the state, it merely pooled the gas rights, leaving the oil rights as they were in the original leases. That the state saw fit to incorporate the intention of the parties in a new agreement retaining many of the provisions of the original leases, and making the necessary changes to accomplish a pooling under section 1882.2, does not nullify its attempt to take advantage of the pooling plan.

Thus far, in considering the questions presented, we have assumed that under section 1882.2 the only substantial changes which may be made in an existing lease are those relating to delay rentals, delay drilling penalties and royalties. Under the broad powers granted to the board by section 1882.7, we think section 1882.2, so far as it enumerates the modifications which the board can make, was not intended to be exclusive. We think the board has the right to change or modify existing leases in any respect not inconsistent with the Enabling Act, the Constitution or statutes. This right exists by the express provision in section 1882.7 and is not denied by section 1882.2. (Com-

pare *Rhoads Drilling Co.* v. *Allred,* 123 Tex. 229, 70 S. W. (2d) 576, where a similar question was considered.)

This brings us to the question whether section 1882.2, which authorizes the proposed plan, is in conflict with the Constitution or Enabling Act.

It is contended by plaintiff that the Congress of the United States has never consented to the state entering into agreements for the pooling of the school lands with privately owned lands for unit operation for the production of gas and the apportionment of royalties, and that the only method provided by the Enabling Act or the Constitution for disposal of the school lands or interests therein is by sale or lease, and that neither of these methods authorizes the contemplated pooling agreement. He argues that the relationship between the federal government and the state of Montana in regard to the school lands is one of trust, and that the state of Montana is a trustee of the school lands. He then contends that under the law of trusts, the trustee must strictly conform to the directions contained in the trust instrument. Therefore, he asserts, there being no express authority for entering into these pooling agreements in the articles of trust (in this case the Enabling Act and the Constitution), that the state, being the trustee, cannot enter into such an agreement.

We agree with the primary contention that the state is a trustee in this instance (*State ex rel. Bickford* v. *Cook,* 17 Mont. 529, 43 Pac. 928; *State ex rel. Dildine* v. *Collins,* 21 Mont. 448, 53 Pac. 1114; *State ex rel. Koch* v. *Barret,* 26 Mont. 62, 66 Pac. 504; *State ex rel. Gravely* v. *Stewart,* 48 Mont. 347, 137 Pac. 854; *Rider* v. *Cooney,* 94 Mont. 295, 23 Pac. (2d) 261), and that a trustee must strictly conform to the directions of the trust agreement (*Murphy* v. *Delano,* 95 Me. 229, 49 Atl. 1053, 55 A. L. R. 727; 26 R. C. L. 1372; Pomeroy's Equity Jurisprudence, 3d ed., vol. 3, sec. 1062), but we cannot agree with his conclusion that because a direction authorizing a pooling agreement is not included expressly in the Enabling Act or the Constitution the authority does not exist.

Section 11 of the Enabling Act provides that "the said lands may be leased under such regulations as the legislature may prescribe; but leases for grazing and agricultural purposes shall not be for a term longer than five (5) years; mineral leases, including leases for exploration for oil and gas and the extraction thereof, for a term not longer than twenty (20) years; and leases for development of hydro-electric power for a term not longer than fifty (50) years." Section 2 of Article XVII of the Constitution grants authority to sell or lease lands "under such rules and regulations as may be prescribed by law." From the Enabling Act, then,. we find a general authority to enter into agreements for the lease of land for the extraction of gas and oil. This grant was accepted by the legislature of Montana. (Chap. 84, Laws of 1933.) It is true that it does not say pooling agreements, but it does comprehend an agreement whereby the oil and gas possibilities may be exploited. The agreement here presented is one whereby the state leases its lands for the exploration for gas under an arrangement which is designated as a "Consolidated Lease and Operating Agreement." It may amount to the sale of an interest in land—a point which we shall hereinafter discuss.

As has already been pointed out, the state of Montana is a trustee of those lands granted by the United States government to the states for common schools. The Enabling Act and the Constitution give the authority to the state to lease its lands. The Enabling Act provides that lands may be leased for the purpose of gas extraction. If the agreement in question here be treated as a lease of lands, there is ample authority in the Enabling Act and the Constitution for the legislature to prescribe the method and the terms by which the lease is to be made. But the plaintiff contends that the consolidated lease amounts to the sale of an estate or interest in land. There are cases supporting this view. (*State ex rel. School Dist. No. 1 in Weston County* v. *Snyder,* 29 Wyo. 163, 212 Pac. 758; *State ex rel. Moody* v. *Hatcher,* 115 Tex. 332, 281 S. W. 192; *School Dist. No. 23* v. *Commissioners of Land Office,* 166 Okl. 226, 27 Pac. (2d) 149.) If we treat section 1882.2 as authorizing a sale of an estate or

interest in land, we still think it is not at variance with the Enabling Act or the Constitution. Section 11 of the Enabling Act provides ''that all lands granted by this Act shall be disposed of only at public sale after advertising'' etc. ''That none of such lands, nor any estate or interest therein, shall ever be disposed of except in pursuance of general laws providing for such disposition, nor unless the full market value of the estate or interest disposed of, to be ascertained in such manner as may be provided by law, has been paid or safely secured to the state.'' The Constitution of Montana, section 1, Article XVII, accepts this grant in the following language: ''And none of such land, nor any estate or interest therein, shall ever be disposed of except in pursuance of general laws providing for such disposition, nor unless the full market value of the estate or interest disposed of, to be ascertained in such manner as may be provided by law, be paid or safely secured to the state.'' That section further provides that a state board of land commissioners shall act as the state's agent in administering this trust and empowers this board to classify these lands for the various purposes.

Plaintiff contends that under section 11 of the Enabling Act an estate or interest in lands cannot be sold except at public sale after advertising. This contention cannot be sustained. That limitation has to do only with a situation where the whole interest in the land is sold. When only an estate or interest in the land is sold, section 11 provides that the full market value of the estate or interest disposed of shall be ascertained ''in such manner as may be provided by law.'' Such also is the provision of section 1 of Article XVII of the Constitution. Hence, when an estate or interest in lands is sold, as distinguished from the land itself, there need not be a public sale and advertising unless the legislature so directs. In other words, when there is a sale of only an estate or interest in such lands, the legislature is given ample power to determine the method by which to ascertain the full market value of the estate or interest. (Compare *Leuthold* v. *Brandjord,* 100 Mont. 96, 47 Pac. (2d) 41.)

Pursuant to this authority the state legislature has provided by law for the details of such disposal. Sections 1882.1 et seq. provide that the lease for oil and gas shall not cover more than 640 acres nor shall be for a royalty less than 12½ per cent. These sections were amended in 1933, and it is there provided: "Nothing herein contained, or in Chapter 108 of the session laws of the state of Montana of 1927 (secs. 1882.1 to 1882.24) or elsewhere, shall prevent or be so construed as to prevent the state board of land commissioners from entering into agreements for the production of gas and the apportionment of gas royalties on an acreage or other equitable basis." This section then exempts the consolidated lease agreement from the statutory provisions which may be in conflict with the particular lease.

The board then is confronted with the problem of insuring ██ to the state the full market value of the estate disposed of and receiving the proceeds and providing that they remain intact, and on such determination this court will not substitute its opinion for the opinion of the board, nor will it control the discretion of the board unless it appears that the action of the board is arbitrarily and, in effect, fraudulent. (See *State ex rel. Gravely* v. *Stewart*, supra; *Rhoads* v. *Allred*, supra.)

It is presumed that the parties in interest believe that there ██ is gas underlying the state lands and other lands in the proposed unit. The gas thereunder is considered *ferae naturae* and is capable of being reduced to the ownership of the party who captures it. The gas, as shown by geological experience, is highly fugitive in character; that is, a well may be drilled upon state land and drain gas from the surrounding land in the unit and even beyond the bounds of the unit, and vice versa. The state board of land commissioners, faced with this fact and the fact that the distributing facilities were entirely in one ownership, that the market was limited and that it would not of itself develop and produce gas, concluded that the state could be best protected by participation in this agreement. It concluded that the market value of the state's interest in gas underlying this unit was 720/1920ths of 12½ per cent. The board

was acting according to what it thought was to the best interest of the state, and has consummated an agreement which we are not able to say is not beneficial to the state. It had the authority to enter into the agreement, and we are not concerned with its wisdom, it not appearing affirmatively that the interests of the state have not been fully protected.

The plaintiff contends that the state by becoming a joint owner of the gas relinquishes 1200/1920ths of the royalty in gas produced on state lands to other landowners in the unit, and thus barters an estate or interest in school lands to the owners of other lands. This contention overlooks the migratory character of gas. (*Gas Products Co.* v. *Rankin*, 63 Mont. 372, 207 Pac. 993, 24 A. L. R. 294; Thornton on Gas & Oil, sec. 51.) There is no actual ownership of gas *in situ*. (Summers on Oil & Gas, page 102.)

The gas underlying state lands may be brought to the surface on adjacent lands, and, conversely, gas brought to the surface on state lands may actually drain from adjoining lands. Each landowner over a gas structure has co-equal rights to reduce the gas to his possession, but he who first reduces the gas to possession on his lands is the owner thereof. Hence, to avoid excessive drilling expenses in the drilling of off set wells, the plan of unit operation was devised. Under the plan here, the state will secure 720/1920ths of 12½ per cent. of the gas brought to the surface on the unified area. In other words, it will share in all the gas brought to the surface on the unified area in proportion to the acreage owned by it in that area. At least theoretically, gas produced from any part of the area will drain from the entire area.

We cannot say that such an arrangement does not fully protect the rights in securing to it its full share of the gas underlying its lands.

The plaintiff urges "that under the consolidated lease and operating agreement, the state of Montana will donate to the lessee the gas produced on school lands and used by it on the other lands in the unit, and to the other lessors the gas produced from the school land and used by them for their

domestic use," and that such provision contravenes section 1 of Article XVIII of the Constitution which reads as follows: "Neither the state, nor any county, city, town, municipality, nor other subdivision of the state shall ever give or loan its credit in aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association or corporation, or a joint owner with any person, company or corporation except as to such ownership as may accrue to the state by operation or provision of law."

Plaintiff objects to the use of gas for domestic purposes produced on state lands by other landowners in the unit, and to the right to use gas produced on state lands for the purpose of development of gas on private lands in the unit. The objection is without merit. These provisions are not in conflict with either the Constitution or the Enabling Act or statutory provisions, and were rightly considered as factors in determining what the market value of the interest of the state was at the time the board agreed to enter into the contract. (See *Greene* v. *Robison*, 117 Tex. 516, 8 S. W. (2d) 655.)

Other contentions made by plaintiff have been considered and we find nothing in them which affects the validity of the proposed agreement.

The case of *State ex rel. School Dist. No. 1 in Weston County* v. *Snyder*, supra, announces principles which have application here. The court in that case said: "The final disposition of the oil or gas, or sale, if we please to call it so, does not take place— is not in any event consummated—until after the oil is taken from the earth, has become severed from the realty, and has become personal property. There is a peculiar difficulty, as pointed out in the *Evans Case*, of disposing at public auction of minerals contained in the land, the quantity of which is—nay, even the very existence of which may be—doubtful, and in the absence of more specific provision in our Constitution, we should not be inclined to hold that such leases are invalid unless let after public auction. Method and means should, necessarily, be of secondary moment. The matter of primary importance

is the realization of the best price possible for the benefit of, and to preserve, the permanent fund."

Finding no ground for condemning the proposed agreement, the relief sought is denied and the proceeding dismissed.

ASSOCIATE JUSTICES STEWART, ANDERSON and MORRIS concur.

MR. CHIEF JUSTICE SANDS, Dissenting:

This action is a friendly suit to test the right of the state board of land commissioners to enter into a consolidated lease and operating agreement affecting state school lands. The plaintiff, Mr. E. G. Toomey, represents himself as a taxpayer of the state and, therefore, as an interested party bringing this action in the interest of the state, the plaintiff alleges the facts of the leasing of certain school lands to individuals, which leases are made to the Glacier Production Company, a foreign corporation, for the purpose of developing the purported gas field.

There are several vital constitutional objections to this contract. Section 20, Article XV of our state Constitution provides:

"No incorporation, stock company, person or association of persons, in the state of Montana, shall directly, or indirectly, combine or form what is known as a trust, or make any contract with any person, or persons, corporation, or stock company, foreign or domestic, through their stockholders, trustees, or in any manner whatever, for the purpose of fixing the price, or regulating the production of any article of commerce, or of the product of the soil, for consumption by the people. The legislative assembly shall pass laws for the enforcement thereof by adequate penalties to the extent, if necessary for that purpose of the forfeiture of their property and franchises, or in case of foreign corporations, prohibiting them from carrying on business in the state."

There can be no question but that this is an attempt to "regulate" the production of an article of commerce and of a product of the soil for consumption by the people. An attempt to interpret this simple language would be a waste of

time. (*Great Northern Utilities Co.* v. *Public Ser. Com.*, 88 Mont. 180, 206, 293 Pac. 294.) All the attorneys having this case under consideration designate this contract as an attempt at "orderly production" of natural gas. It may be admitted the Constitution did not contemplate gas production when this section was written, but as written it prohibits an attempt at orderly production, and it is not within the province of this court to rewrite the Constitution to fit the changed conditions. If a change in the Constitution is necessary or desirable a practical procedure therefor is provided in that instrument.

I find the history of this consolidated lease and operating agreement as entered into to be as follows: The matter of the leasing of these particular state lands, and the interest therein of the Montana Power Company has been before the board of land commissioners on several occasions and the argument has been carried over for quite some period of time. In conferences pertaining to the consolidated lease contract, the Glacier Production Company has been represented by John E. Corrette, Jr., of Butte, Montana, who is attorney for the Montana Power Company, and who so represents himself at these conferences; that at the final conference, wherein the board agreed to give the contract, the attorneys for the Glacier Production Company stated they would bring a test case before the supreme court, testing the right of the state land board to enter into such a contract, and simultaneously therewith exhibited copies of the proposed complaint and briefs on the subject illustrating that they were already prepared for this test suit, which I repeat demonstrates that the action is a friendly action. The decision of the land board was not unanimous; however, upon the representations of the Glacier Production Company and after going into investigation of the right of the Glacier Production Company to do business in the state of Montana, the majority of the land board executed the agreement which is before the court for construction upon the understanding that the matter would be left to the judgment of this court.

The articles of incorporation of the Glacier Production Company authorizes this company to do practically everything that

is possible under the articles of incorporation authorized in any state; that is, it gives them a great deal more authority than do the Constitution and statutes of the state of Montana give to a domestic corporation, and therefore, much more authority than would be permitted had the Glacier Production Company incorporated under the laws of our state. The articles of incorporation of this company include the following significant clauses: ''To do any and all things herein set forth to the same extent as natural persons might or could do * * * '' ''But nothing herein contained is to be construed as giving this corporation the power of constructing, maintaining, and operating public utilities within the State of New Jersey.''

Therefore, the state of New Jersey strictly prohibits this corporation, incorporated under the laws of its own state, from doing business with the citizens of that state. Such proceeding on the part of the state of New Jersey gives us the right to infer that New Jersey will not trust the Glacier Production Company with its right to operate public utilities, to do business with its own citizens, but will give it the power to go into other states, such as will permit the said corporation to enter, and operate therein. The incorporators of the Glacier Production Company are all citizens of the state of New York and its directors are the identical persons who are the directors of the Montana Power Company. The official statement asserts that all stock is owned in Montana. Then why incorporate in New Jersey?

The Glacier Production Company openly and deliberately violates every requirement of section 10, Article XV, which reads: ''No corporation shall issue stocks or bonds, except for labor done, services performed, or money and property actually received; and all fictitious increase of stock or indebtedness shall be void. The stock of corporations shall not be increased except in pursuance of general law, nor without the consent of the persons holding a majority of the stock first obtained at a meeting held after at least thirty days notice given in pursuance of law.''

The state, by approving this contract, and probably many more like contracts in the future, with foreign corporations, thereby lends its approval to these discriminatory contracts to the great disadvantage of the domestic corporations and the loyal citizens of the state. We thereby approve a deliberate violation of our Constitution and thereby invite proposed corporations to incorporate in other states, thereby losing many fees that would be collectible from these corporations if the incorporation were under the laws of this state where the business is to be done.

Litigations involving contracts with foreign corporations are triable in federal courts at the option of such foreign corporations. The regulatory provisions of our Constitution and Code are not enforceable, as for instance our eight hour laws and many other laws of like character. The federal courts are completely out of sympathy with such laws and many of such laws could not be made applicable to the procedure in federal courts.

Great injury will result from the disability of the state to enforce this contract in its own courts and it is, therefore, a contract violative of the provisions of section 11, Article XV of the state Constitution, which reads as follows: "No foreign corporation shall do any business in this state without having one or more known places of business, and an authorized agent or agents in the same, upon whom process may be served. And no company or corporation formed under the laws of any other country, state or territory, shall have, or be allowed to exercise, or enjoy within this state any greater rights or privileges than those possessed or enjoyed by corporations of the same or similar character created under the laws of the state."

The recognized effect of this contract shall be to compel the state and the other co-owners in the unit to have their legal rights adjudicated by federal courts instead of state courts. It will also violate the provisions of section 18 of the same Article of the Montana Constitution, which reads as follows: " * * * All corporations shall have the right to sue, and shall be subject to be sued in all courts in like cases as natural persons, subject to such regulations and conditions as may be

prescribed by law.'' This reference to courts undoubtedly has reference to state courts and this contract will thereby further violate the practical effect of that provision and allow this foreign corporation to enjoy privileges that corporations organized under the law of this state cannot enjoy, namely, the right of defending its title in federal instead of state courts. Then the contract giving the foreign corporation such extra privileges should further be held contrary to the provisions of section 9 of the same Article, which reads: '' * * * And the police powers of the state shall never be abridged, or so construed, as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals, or the *general well being of the state.*''

This privilege of foreign corporations is certainly contrary to the general well-being of the state. Foreign corporations are held by federal courts to have the privilege of having their rights determined in federal courts. The Tenth Amendment to the United States Constitution provides: ''The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively or to the people.''

There is no law or constitutional provision granting this privilege, just a holding of the federal courts. The federal courts have held that the rights of corporations incorporated in different states (even though it may do no business in the state of its incorporation) may, upon the application of any such foreign corporation, on the false theory of diverse citizenship, be tried in the federal courts. This state cannot circumscribe the authority of federal courts when once these courts have lawfully assumed jurisdiction, but we can deny that jurisdiction by denying them the right to make such contracts as this in this state, since a contract of this nature gives to the foreign corporations greater rights and privileges than are granted domestic corporations it is void in its entirety. This privilege is contrary to the ''equal rights of individuals, or *general well being of the state.*''

Many of us know from experience and observation that this state cannot practically protect its rights in the federal courts, and especially the poor man cannot protect his rights against these big corporations in federal courts. The costs of a suit, first in the federal district court, then in San Francisco circuit court, and finally in the Supreme Court at Washington, D. C., are enough to intimidate all but millionaires from attempting to litigate in federal courts with these big corporations. The delay incident to such litigation in federal courts is enough to discourage any ordinary business man in even attempting to litigate his rights in such courts. These corporations annually retain the ablest lawyers. Delay and expense are encouraged. Corporations have perpetual rights. Citizens die.

The United States Constitution (Eleventh Amendment) provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." The incorporation in the foreign state may and usually is for the sole purpose of establishing the foreign citizenship. It is a fraud upon the state in order to acquire a foreign citizenship and thereby it gives the right to try its cases in the federal courts.

But the federal courts further permit a camouflage that allows suits to be brought against the officers of the state in lieu of the state itself. This evasion is so plain that every citizen can see. The state boards are the state itself and such construction is the only possible one. It is excused by the plea of "precedent," an excuse that often permits much injustice. We all know as a practical common illustration that as soon as the State Railroad Commission makes an order fixing the rates of power and light in any city in the state, the Montana Power Company, as a foreign corporation, immediately brings suit in the federal courts to set aside such rate of the commission. (See *Montana Power Co.* v. *Public Ser. Com.,* 12 Fed. Supp. 946, decided November 20, 1935.)

Judge Black in his recent famous dissenting decision in the Indianapolis water right case in the United States Supreme

Court points out this injustice so vividly that every citizen interested in fair play should read it carefully. In the majority opinion, the city of Indianapolis, after six years of litigation in federal courts, was compelled by that majority decision to go back and start almost at the beginning to get a hearing on fair rates for city water. The finding six years ago of the State Public Utilities Commission of Indiana was used merely as a football by the federal courts. The right of the state of Indiana to manage its own affairs was ignored. Jurisdiction is claimed by federal courts in such cases upon the ground of the Fourteenth Amendment to the United States Constitution, in which the pertinent part reads as follows: " * * * nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." The federal courts hold that under this provision "persons" and "citizens" include corporations and they may thereunder claim protection in federal courts as a diversity of citizenship but there is certainly no United States constitutional provision which even suggests such interpretation of these words. (*Connecticut Gen. Life Ins. Co.* v. *Johnson*, 303 U. S. 77, but also see the dissenting opinion of Justice Black, above adverted to, one of the most important expositions of law that can be found anywhere in the books.)

The option of a foreign corporation under the Eleventh Amendment to the United States Constitution, as a citizen of New Jersey to resort to the federal courts in a case involving Montana state lands, is an option not available to domestic corporations or Montana citizens, as it amounts to a privilege prohibited by our section 11, Article XV: "No foreign corporation shall do any business in this state without having one or more known places of business, and an authorized agent or agents in the same, upon whom process may be served. And no company or corporation formed under the laws of any other country, state or territory, shall have, or be allowed to exercise, or enjoy within this state any greater rights or privileges than those

possessed or enjoyed by corporations of the same or similar character created under the laws of the state.''

The word ''privilege'' as used therein has a well-defined meaning and needs no citations here. The attempted purchase then, by this foreign corporation, of natural gas in place would give it authority as a property owner in Montana subject to the protection of federal courts under federal court rulings and thereby it would have greater privileges than a domestic corporation, that is, the privilege of trial in federal courts, as heretofore stated, which would be beyond the power of a domestic corporation in this state. Such being the case, the state could not be authorized to enter into such a contract as it thereby would be giving this foreign corporation the privilege of carrying into the federal courts any litigation involved as a suit between the citizens of different states, a right which is not open to domestic corporations.

Here we may also raise another objection to this proposed contract which attempts to impose upon the state and especially more particularly the citizen land owners, who join in this unit agreement, a disadvantage not argued or briefed. The state law requires all actions involving real estate or the possession thereof to be tried in the county where located; in this case it would be Glacier county as the land is located in that county. But this case would not be commenced or tried in Glacier county in a federal court as there is no federal court that sits in that county. This foreign corporation as a land owner in this case must be accorded a special privilege not accorded to domestic corporations, or to private citizens of the state if it may bring the case in another county which in many cases might be vastly important.

For the sake of argument on the principal question, we now consider the right of the state to enter into this unit agreement. It may not violate any law of our state constitutional provisions pertaining to state school lands, but for the reason of policy and positive constitutional prohibition authorizing this special privilege of trying all its cases in the federal courts upon the ground of divergent citizenship, the unit contract can-

not be authorized to grant the right to own real estate, or natural resources, in the state as it is against the constitutional advantage over domestic corporations and the ''well being of the state'' for the reasons stated. We cannot afford to force our citizens to take their troubles to Washington for litigation. Indeed, we have not the power.

The state even though it has the power should not by this example encourage its citizens to allow these foreign corporations to come into this state. Foreign corporations in many ways successfully escape state taxation and regulatory provisions required of domestic corporations. The fact that these utility corporations all do organize in foreign states is proof positive that they recognize such advantage over the domestic corporations by such foreign incorporation.

I further object to this consolidated lease and operating agreement for the reason that it opens the door to a gigantic fraud. The previous contract with the state requires rentals for delay in putting down gas wells. This one does not require delay rentals except perhaps an annual rental of $1. There is nothing to prevent the drilling of a well on land adjoining the lands of the consolidated lease and thereby draining off all the gas under this unit while the hands of the state and other unit holders are tied from seeking a market for their gas elsewhere. It is a one-sided contract binding on the state for at least 15 years, but subject to cancellation by the company any time by the payment of the nominal sum of $1. A unit agreement to be of any value under the principle claimed for unit agreements would have to include all the gas-bearing lands in that particular field. This gas-bearing area is now so well defined and mapped that the whole field, it is authoritatively claimed, could be included in one unit. Such a unit is necessary when the migratory character of natural gas is considered in connection with this consolidated lease.

The briefs of counsel indicate that they agree, and I believe that it is beyond question, that the purpose of unit operations is to insure the development of gas deposits in an efficient manner, to conserve natural resources and to protect the correlative

rights of owners in a common source of supply of gas. The consolidated lease and operating agreement which has been approved by a majority of the members of the state board of land commissioners does not assure any of these advantages which would be assured by true unit operation. As a matter of fact, it is only the Glacier Production Company which is benefited by the obligations under individual leases, including payment of delayed drilling penalties, which are here dispensed with. It is because of the fact that the proposed consolidated lease is a lease superseding existing leases that it is contrary to the statute authorizing unit operations and because it is a lease and not a pooling agreement for unit operations it is contrary to the specific provision of section 1882.2 of the Revised Codes of Montana, 1935, which limits the amount of land which may be included within a lease of 640 acres of state-owned lands, for the consolidated lease proposes to include 720 acres, of such state lands. Because the consolidated lease and operating agreement is not an agreement for the pooling of acreage with others for unit operations for the production of gas as but a consolidated lease it is contrary to the provisions of section 11 of the Enabling Act and section 4 of Article XI of the state Constitution. The power of the state and the state board of land commissioners to lease lands granted by Congress is entirely circumscribed by such regulations as the legislature may prescribe. (*Leuthold* v. *Brandjord et al.*, 100 Mont. 96, 106, 47 Pac. (2d) 41.) The legislature has never authorized the disposal of any interest exceeding 640 acres in state lands through such an instrument as the consolidated lease and operating agreement under consideration in ' this case. Federal courts have no right to waste their time on this purely local affair. The state courts are far better prepared to consider the questions.

This holding involves a vastly important governmental policy not heretofore considered in this court or by the people of the state, and I realize the seeming revolutionary character of the holding, but we are living in an age of progress in all directions. This pioneer trend is a subject comparatively new as is the law

of petroleum products and demands the formation and application of new legal principles. Modern law, in this particular, warrants study by the people as well as by the courts. This holding respecting the right of foreign corporations may revolutionize preconceived notions, but will lead toward justice and eventually will encourage in the people a confidence in the law as declared in actual practice by the courts, a confidence in courts that is now alarmingly lacking in the people. No injustice will arise from this proposed new holding. The rights of the whole people will be better protected. All citizens who favor home rule as distinguished from federal government rule should approve a policy that would make it possible and practical to control our own state natural resources at home rather than from Washington. Henceforth let our motto be: Home rule for natural resources.

In the case of *MacGinniss* v. *Boston & Montana etc. Co.*, 29 Mont. 428, 75 Pac. 89, a very important constitutional question respecting foreign corporations was decided in favor of the foreign corporation, but evidently the officers and attorneys of that corporation did not have confidence in the correctness of the principles enunciated in that opinion, as within two years the Amalgamated reorganized as a Montana corporation under the name Anaconda Copper Mining Company, thereby subjecting itself to the laws of Montana.

A decision against this foreign corporation, warranted by many very good sound reasons, part of which I have pointed out herein might effect a very desirable reform of our busines procedure in Montana, especially respecting natural resources. I know of no present question of so much importance to the people of Montana.

Perhaps we all can agree after mature consideration upon a more practicable statement of the proper principles along the lines of section 20, but that important change should be made by the people, and not by the courts. We, as judges, are sworn to support and defend the Constitution of the state—not to make over the Constitution as we think it should be.

This is too important a question to be passed upon by this court without argument, if, indeed, there is any room for argument. Nothing is said in the brief or oral argument of any counsel, respecting this question of so great importance. At best we can only follow the plain language of the Constitution.

This lease contemplates the acquirement of vast future rights that will in time amount to a huge monopoly of the gas interests of this state. A monopoly that will control the cost of natural gas to the citizens of the state. The plan is apparent from the fact that the official report filed in the office of the Secretary of State fixes the present value of these gas rights at $1,000,000,000, which indicates the price the Glacier Production Company expects to charge, through the Montana Power Company, the people of the state, though its investment is comparatively small. Or, more probably, these companies, through their monopolistic gas rights, hope to wrest from any company that undertakes to come in from outside the state.

For the foregoing three reasons: First, the Glacier Production Company is a foreign corporation not authorized to purchase or own real estate in Montana or to do business in the state of Montana for the reason that it has not complied with the requirements of the Montana Constitution. Every contract or purchaser of property in the state must first show its capacity. In the case of natural persons the right is uniformly presumed. But in the case of corporations the presumption is exactly contrary. The courts uniformly require that the right of the corporation be made to appear. The mere allegation that a corporation has been formed under the laws of the state of Montana is but the allegation of a conclusion of law, and is ineffectual for any purpose. The statutes specifically require and the courts unanimously hold that unless allegations of conclusions of law are preceded by the allegations of fact they have no effect therein. We have here a breach of this well known rule of pleading respecting the allegation of legal conclusions. That corporations often violate this rule matters none. The rule is founded on very sound reason and long established precedent. In fact, the rule is but the expression of fundamental law. The

necessity of a person or corporation showing a right to own property in the specific jurisdiction is the first consideration in every case. The attempt to replace the fundamental right to own property by a mere legal conclusion does not fulfill the requirement of established law. Much more is this true where the official public records clearly disclose that the vital constitutional requirements for valid incorporation have been openly violated. I cannot believe that my associates, rendering a contrary opinion on this subject, have given the matter appropriate consideration.

Second, the contract is not fair to the state and its citizens inasmuch as it is binding on the state for 15 years at least and subject to cancellation any time by the company; and, third, it infringes the state Constitution (sec. 20, Art. XV), by attempting to regulate the production of an article of commerce.

I, therefore, most emphatically dissent from any decision authorizing the execution of this contract by the state land board.

---

ON MOTION FOR REHEARING.

(Filed June 2, 1938.)

Opinion: PER CURIAM.

On motion for rehearing the contention is made that because ▮ of the provision in the Consolidated Lease and Agreement which authorizes the Glacier Production Company to shut down wells whenever it deems it inadvisable or inexpedient to produce or sell gas from wells on the unit area by paying $200 per year for each well shut down, it is possible that all the gas from under the unit area might be drawn out of a well lying outside the area included in the Consolidated Lease and Agreement.

This court, in the absence of a pooling agreement, has held that when there is no market for gas, the drilling of offset wells would furnish no protection to the landowners whose land was being drained. (*Severson* v. *Barstow,* 103 Mont. 526, 63 Pac. (2d) 1022.) If, however, the situation ever arises when the Glacier Production Company attempts to shut down wells while

at the same time it operates wells on other property which drains from the unit area, or operates other wells which could be shut down without injury to it, questions would then arise regarding the construction of the contract which are not directly involved here. The contract is not susceptible to a construction which would permit arbitrary or capricious action on the part of the operator and which would enable the company to take advantage of its own wrongful conduct or to perpetrate a fraud upon the state. In order to show that it was inadvisable or inexpedient to produce or sell gas within the meaning of the contract, it would be obliged to measure its action by the conduct of a reasonable person acting in good faith. (*Waite* v. *C. E. Shoemaker & Co.,* 50 Mont. 264, 146 Pac. 736.)

Other points were raised on motion for rehearing, but they have been treated in the original opinion, to which we adhere.

The motion for rehearing is denied.